Roy A. **FACCHINA,** Plaintiff,

v.

**NECA–IBEW LOCAL 176 HEALTH AND WELFARE FUND,** Defendant.

No. 87 C 7686.

United States District Court, N.D. Illinois, E.D.

Sept. 13, 1988.

---

Bennett J. Braun, Roman R. Okrei, Stefanich, McGarry, Wols & Okrei, Ltd., Joliet, Ill., for plaintiff.

Bernard M. Baum, Alan H. Auerbach, James M. Neuman, Baum & Sigman, Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

After a bench trial on August 29, 1988, the court ordered both parties to submit proposed findings of fact and conclusions of law. Having considered these submissions, and the evidence presented at trial, the court finds as follows:

### FINDINGS OF FACT

1. Plaintiff Roy Facchina brought this action against the trustees of NECA–IBEW Local 176 Health and Welfare Fund. The trustees were dismissed as parties upon the motion of the defendant and the Health and Welfare Fund was substituted in as the sole defendant in this cause.

2. Plaintiff's one count complaint alleges violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiff asserts that he was arbitrarily or capriciously denied medical benefits to which he was entitled. He seeks the payment of certain medical bills incurred for testing for male impotence and treatment by surgical implantation of a penile prosthesis.

3. The court has jurisdiction over this case pursuant to 29 U.S.C. Section 1132(e)(1).

4. In 1960, plaintiff became a member of IBEW Local 176 and later became a participant in its Health and Welfare Fund ("the Plan"). Facchina was a participant in the Plan at the time he applied for payment of the above noted benefits. At all times pertinent to this case, plaintiff was eligible for medical benefits under the Plan.

5. The Plan is an employee welfare benefit Plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

6. The Plan is administered by six trustees, three of whom are appointed by union management and three of whom are selected by participating employers. The trustees hear claims appeals. Appeals are typically heard by two-man committees selected by the full board of trustees. The claimant may present his appeal to the two-man committee, which summarizes the appeal to the full board. The full board then issues a final decision.

7. The surgical expense benefits section of the "Summary Plan Description" booklet distributed to participants states: "[w]hen as a result of an accident or sickness, Surgical Benefits are payable for surgical fees charged by a legally qualified physician or surgeon, when the Employee or dependent is eligible, up to the amounts set forth in the Schedule of Surgical Benefits, but not to exceed the maximum for all operations performed. Surgical procedures may be performed in a hospital, doctor's office or elsewhere."

The exclusions and general limitations section of the Summary Plan Description states the Plan does not cover, *inter alia,* any of the following:

"(5) Accidents or sicknesses resulting directly or indirectly from self-induced drugs, barbiturate consumption, illness or injury;

(9) Elective sterilization procedures such as tubal ligation, vasectomies or newborn circumcisions;

(13) Injury or sickness which arises out of or in the course of any occupation of employment for wage or profit;

(14) Cosmetic surgery, except for treatment of an injury sustained in an accident while coverage was in force."

8. In 1973, Facchina suffered aortic valve damage from bacterial endocarditis, a bloodstream infection which affects the heart and surrounding tissues. In 1981, surgery was performed for the implantation of artificial heart valves to replace those damaged by the infection.

9. In the spring of 1986, Facchina obtained a routine "cardio checkup" at the Mayo Clinic in Rochester, Minnesota, and at that time complained of impotence. He was examined by a doctor at the clinic, who indicated that Facchina should undergo further testing to determine the cause of this problem.

10. In May, 1986, Facchina, while undergoing other procedures at Mayo Clinic, was given a series of tests to determine the causes of the impotence and at that time psychological and drug-induced causes were ruled out. Facchina was informed that his cardiac output was the primary cause of the impotence and that one form of treatment is the implantation of a penile prosthesis.

11. Facchina informally discussed with a co-worker, Lloyd Gadbois, who is also a trustee of the Plan, whether the cost of the procedure would be covered under the Plan's provisions.

12. Gadbois told Facchina that the procedure probably would not be covered, but that he should submit his materials anyway.

13. Prior to undergoing the actual implant procedure, Facchina submitted various materials to Gadbois.

14. Mr. C. Michael Becker, the Plan's consultant, was requested to prepare a memorandum regarding the penile prosthesis procedure and its coverage status under the terms of the Plan. He prepared such a memorandum, which was dated August 21, 1986.

15. The memorandum indicated that a trustee had requested that the topic of penile prosthesis and its eligibility under the Plan be placed on the Board agenda and also indicated that although an actual claim had not yet been made for benefits, an eligible participant had consulted with his physicians and intended to undergo the implant surgery.

16. Facchina underwent the penile implant surgery in early September, 1986 and submitted his actual claim for benefits to the Fringe Benefit Funds Office in late September, 1986.

17. Prior to Facchina's submission of his claim, the Board of Trustees met on September 10, 1986, to discuss the penile implant procedure and whether benefits would be considered payable for such a procedure. Becker's memorandum and the materials plaintiff submitted to Gadbois were given to the Board members. The Board decided that the procedure did not meet the qualifications established by the Plan and was therefore not reimbursable under the Plan. It then directed the Fringe Benefit Fund office to deny any claims for penile implant surgery.

18. Subsequent to Facchina's return to work after the penile implant surgery of early September, two cartoons authored by Trustee Gadbois, depicting plaintiff and the penile implant, were copied and circulated at a job site where plaintiff was working.

The cartoons depict claimant's serious health problem in a mocking, demeaning manner. [See Appendix.]

19. On October 3, 1986, the Fringe Benefit Funds Claim Office, by mailed notice, informed Facchina that his claim for benefits for the implant surgery and treatment was denied for reason that: "no illness present for elective surgery to be performed."

20. Facchina then appealed the claim denial to the full Board of Trustees, submitting as written documentation a summary of his appeal, a description of his medical history, a description of the testing for the cause of the impotence, the second opinion of Dr. A. Razma, copies of all relevant bills, and a letter from Dr. John W. Joyce of Mayo Clinic stating that the surgery was needed as a result of organic illness and not psychological problems. He also requested that he be allowed to appear personally at the December 10, 1986 Board meeting.

21. Facchina appeared at the Claims Appeal Committee meeting on December 9, 1986. At that time the Claims Appeal Committee consisted of Lloyd Gadbois (the author of the two cartoons noted above) and Harvey Shriver. Facchina and the two members of the committee discussed the implant procedure and the documentation Facchina submitted.

22. On December 10, 1986, the members of the Appeals Committee were present at a full Board meeting of the trustees and stated that they had reviewed his appeal of the denial of benefits for hospital, surgical and medical expenses related to the penile implant treatment. At that time, the Board of Trustees tabled the final decisions on the matter until the next Board of Trustees meeting.

23. The next meeting was held on March 4, 1987. At that meeting, the full Board of Trustees found that the disease may have been a contributing factor in addition to Mr. Facchina's age (59 years), but decided that the procedure in question was designed to improve function rather than treat a disease which threatened the health of the participant. By a voice vote of five to one the Board decided that the expenses in question were not compensable as Plan benefits, and thus denied plaintiff's claim.

24. At the hearings before the trustees, the only medical evidence considered was the reports of the claimant's physicians. That evidence was all favorable to the claimant. The reports of Dr. John Joyce of the Mayo Clinic, Dr. William Furlow of the Mayo Clinic, and Dr. A. Razma, of Wilmington, Illinois, in substance state claimant suffers from "organic vasculogenic impotence, and is a suitable candidate for implantation of a penile prosthesis." The reports further indicate the "reason for the surgery was for organic illness and not a psychological reason." The parties now do not dispute that Facchina's impotence is the result of decreased cardiac output caused by aortic valve damage.

25. On March 10, 1987, the Fund's advisor, Michael Becker, wrote plaintiff to inform him that his appeal had been denied. Becker stated that the "Fund was created to provide Health Care Benefits which are medically necessary to treat disease or accidental injury or to maintain health." Becker further stated that plaintiff's operation was designed to improve function, not to treat a disease which threatens health. Becker is not a physician and has no formal medical training.

26. The Plan provides no definitions of illness, disease, what is necessary to maintain health, or prosthetic device. No medical definitions and no reasonably workable layman's definitions of these terms have been articulated.

27. None of the Trustees has any medical background or medical training.

28. Each Trustee subjectively establishes his or her own definition for terms such as illness, disease or that which is necessary to maintain health.

## CONCLUSIONS OF LAW

■ 1. The standard of review of claims decided pursuant to the Employee Retirement Income Security Act of 1974 requires the court to decide whether the denial of plaintiff's claim by the Board of Trustees was arbitrary or capricious. *Wardle v. Central States*, 627 F.2d 820, 824 (7th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).[1]

2. Each of the two trustees called to testify, Gadbois and Shriver, agreed that the penile prosthesis would maintain health. Yet each of these individuals voted to deny coverage of the penile prosthesis, despite the fact that the Plan's advisor stated that one purpose of the fund is to maintain health.

3. The only probative evidence before the Board of Trustees and the Claims Appeal Committee indicates that plaintiff was treated for vascular organic impotence. There appears to be no provision in the Plan which excludes treatment of this from payment.

4. The Trustees denied plaintiff's claim on the grounds that his impotence was a condition, not an illness.

5. The Trustees as decision-makers overlooked or seriously erred in appreciating the significance of the only medical evidence presented during the hearing, that the surgically accomplished penile implantation was directly related to organic vasculogenic impotence.

6. Trustee Gadbois, when asked to define "illness," stated that "illness" is "something that stops you from doing a normal days work, daily functions without discomfort." He further agreed that under that definition, plaintiff's impotence was an illness. It is arbitrary to agree that plaintiff's problem was an illness and yet vote to deny coverage on the ground that the problem was a condition rather than an illness.

7. Because the Plan does not define illness, the six trustees operated using as many as six different definitions of illness. Likewise, had plaintiff submitted his claim on a different date, when the Board of Trustees had different members, the Board of Trustees might have utilized definitions of illness different from those used in reviewing plaintiff's claim. The failure to define such a critical term as "illness" resulted, in this case, in an arbitrary decision that impotence is never an illness.

8. This arbitrariness is highlighted by the fact that Trustees Gadbois and Shriver and Trustee Advisor Becker agreed that an artificial foot (a prosthetic device) would be covered under the Plan, as would an artificial eye following removal due to diabetes. No principled reason why the absence of a foot requiring the remedy of a prosthetic device is an illness covered by the Plan while impotence caused by a disease and requiring the remedy of a prosthetic device is not an illness has been articulated.

■ 9. The trustees acted arbitrarily when in denying benefits, without any evidence to support their conclusions, they stated, "... the particular procedure in question is designed to improve function rather than treat a disease which threatens the health of the participant."

10. Trustee Gadbois, by drawing cartoons ridiculing plaintiff's prosthetic device, demonstrated arbitrariness. The cartoons indicate that Gadbois found humor in plaintiff's situation and thus did not hear plaintiff's claim with sincerity.

1. In *Wardle*, the phrase "arbitrary *and* capricious" is used. However, in the same paragraph, reference to the origin of the standard indicates a standard of arbitrary *or* capricious. The court finds that demonstration of arbitrariness is enough to justify reversal. Because arbitrariness is demonstrated in this case, the court does not reach the question of capriciousness, i.e., malice, in defendant's decision.

■ 11. The court has discretion to award attorneys' fees to the prevailing party in an ERISA action. *See* 29 U.S.C. § 1132(g)(1). The factors to be considered are: the degree of the opposing party's culpability, the relative merits of the parties' positions, whether the party requesting fees sought to benefit all beneficiaries of the plan or to resolve a significant legal question, whether an award of fees would deter others from acting similarly, and the ability of the opposing party to pay attorney's fees. *Central States Pension Fund v. 888 Corp.*, 813 F.2d 760, 767 (6th Cir. 1987).

■ 12. Based on these factors, plaintiff should be awarded reasonable attorney's fees. The degree of defendant's arbitrariness was severe, plaintiff was in no way culpable, and plaintiff has brought to light a significant defect in the Plan's interpretation which could impact other beneficiaries.

In sum, the decision of the trustees denying plaintiff's claim was arbitrary. Therefore, plaintiff's claim for benefits shall be paid by defendant. Plaintiff is awarded $9515.11, plus costs and attorneys' fees. Plaintiff is granted leave to file a detailed schedule of costs and attorneys' fees within 14 days. Defendant must file any objections to those fees and costs no more than 7 days thereafter.

IT IS SO ORDERED.

APPENDIX

HELL, I DON'T KNOW —
IT WORKED JUST FINE
IN THE HOSPITAL...

