**Douglas P. HARTMAN, Plaintiff,**

v.

**Federico F. PENA, Secretary of Transportation, Defendant.**

**No. 94 C 5416.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 28, 1995.

---

Phillip S. Wood, Wood & Johnson, Aurora, IL, for plaintiff.

Daniel Edward May, United States Attorney's Office, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Plaintiff Douglas Hartman complains that he was a victim of "Malehook,"[1] the inverse of the infamous 1991 Tailhook Convention, at a cultural diversity workshop ("CDW") sponsored by his employer, the Federal Aviation Administration ("FAA"). Hartman alleges that, in violation of Title VII of the Civil Rights Act of 1964, he suffered sexual harassment and religious discrimination at the CDW, and retaliation for having filed a complaint with the Equal Employment Opportunity Commission. Before the court is Defendant's motion for summary judgment. For the reasons that follow, Defendant's motion is granted in part and denied in part.

---

1. The term was used recently in a squib to refer to Hartman's plight in *The Second Annual Big* *Onion Awards,* Chicago, Oct. 1995, at 72.

## I.

Programs like the CDW, which spawned the facts here, are not uncommon. Due to the rash of discrimination lawsuits over the last decade, many entrepreneurial opportunists have promised employers that they could reduce exposure to liability via "sensitivity" training. John Barnes, *Does Diversity Help Business?*, Investor's Business Daily, May 17, 1995, at A1 (estimating that there are over 5,000 "diversity consultants" who charge between $1,500 to $2,000 a day).

The CDW was a three day program which began in June 1992.[2] It was, and is, the prototype for future FAA workshops. The CDW was not held at the FAA's Chicago Air Route Traffic Control Center ("Chicago Control Center") but at a nearby town. The FAA paid for and encouraged its employees to participate in the program. Indeed, the FAA employees also received regular pay and benefits during the program, and the CDW itself was directed by a mixture of FAA employees and diversity contractors. Although the FAA established a process to excuse employees who did not wish to attend, employees who postponed attendance were required to attend the next scheduled session. (Pl.'s 12(N) ¶ 69.) At the workshop, the directors would conduct a number of exercises for the employees. Hartman declined to take part in the CDW at least two times before he agreed to attend. Hartman claims that, during some of the CDW exercises and discussions, his civil rights were violated.

Hartman was an air traffic controller with the FAA at the Chicago Control Center. Hartman was also a representative for the air traffic controller's union. The principal component of Hartman's Complaint involves a "role-reversal" exercise wherein the directors instructed male employees to walk between two lines of female employees—what Hartman describes as a gauntlet. Defendant contends that the exercise was constructed to mimic the physical environment at the Chicago Control Center and was intended to simulate the experiences women encountered there and in the FAA generally. (Def.'s 12(M) Statement ¶ 22; Def.'s Ex. 14 at 9.) "Women participants in the exercise would make comments to men who proceeded through a line of women while the women may have touched the men on the arm or may have given the man a 'little slap on the butt.'" (Def.'s 12(M) ¶ 24.) "Generally, the men who participated felt embarrassed and uncomfortable about doing the exercise." (Def.'s 12(M) ¶ 40.) Hartman was aware of the nature of the exercise before he attended the CDW. However, while at the CDW, Hartman testified that he did not wish to participate in the exercise (the parties dispute at what point in time he expressed his disapproval). Others voiced their disdain for Hartman because he expressed unwillingness to join in the exercise. Once he acquiesced to proceed between the women, he claims that the women touched his genitalia and other parts of his body, while the preceding male participants laughed and derided him. Defendant admits that Hartman was touched but not as he described.

Following the gauntlet, the directors conducted a discussion. At the discussion, Hartman and the other men were numerically rated with their names on a chart subscribed to drawings of male genitalia. The chart illustrated human penises in various states of arousal. The participants rated Hartman the lowest.[3]

Hartman's claims of religious and racial discrimination stem from comments which the directors made in the discussions. Hart-

---

**2.** The following facts are taken from the parties' submissions filed pursuant to Rules 12(M) and 12(N) of the Rules of the United States District Court for the Northern District of Illinois ("Local Rules").

**3.** How any of this "simulated" what had occurred at the FAA Chicago Control Office remains a mystery. The court is familiar with the misuse of sophomoric humor in the form of drawings displayed to co-workers. *See Facchina v. NECA–IBEW Local 176 Health & Welfare,* 702 F.Supp. 641, 647 (N.D.Ill.1988). However, the submissions of counsel do not indicate that at the Chicago Control Center there were photographs, pictures, calendars or other exhibits of a sensitive nature affixed to the walls. Presumably the directors had other objectives regarding the use of the graphics than to mimic or simulate what the employees at the Chicago Control Center had experienced.

man asserts that the directors made comments about his religion to the group and did not afford him the opportunity to respond. The racially charged comments were made occasionally throughout the CDW.

Hartman also claims that Defendant retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Hartman filed his EEOC complaint on September 23, 1992, and alleged gender and religious discrimination. Hartman did not receive "quality step increases" in 1991–1992 and 1992–1993, and he argues it was in retaliation to his EEOC filing. Defendant contends that Hartman did not receive the increases due to poor work performance. Hartman disputes this, but does not offer any evidence to contradict Defendant's statement. (Pl.'s 12(N) ¶ 61.)

## II.

To survive a motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995). Summary judgment is not a discretionary remedy and must be granted when the movant is entitled to it as a matter of law. *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 621 (7th Cir.1995). In the instant case, the court finds that there are genuine issues of fact as to one of Hartman's claims, but not as to the others.

Regarding the Complaint, the court agrees with Defendant that it may be distilled to three major allegations: (1) the CDW was sexually offensive and demeaning to Hartman; (2) Hartman endured religious and racial discrimination at the CDW; and (3) Defendant retaliated against Hartman after he filed an EEOC complaint. All claims are premised on Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–16(a). To prove a Title VII claim, a plaintiff may establish that the employer had a discriminatory intent in either of two ways. The plaintiff may establish his case either directly, through direct or circumstantial evidence, or indirectly, through the burden shifting method commonly referred to as the *McDonnell Douglas* test. *Kormoczy v. Secretary, Dept. of Housing & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir.1995). Hartman attempts to prove his claims through the indirect method.

## III.

Hartman's first claim involves gender discrimination. More specifically, Hartman alleges that he was sexually harassed. Sexual harassment is a recognized subset of gender discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63–7, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). Title VII prohibits unwelcome sexual advances as creating an offensive or hostile working environment and treats the advances as discrimination. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). There are two categories of sexual harassment. The first is *quid pro quo* sexual harassment. A *quid pro quo* sexual harassment claim involves sexual demands made by an employer on an employee as a condition of employment. *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990). The second category is hostile environment sexual harassment. A hostile, or abusive, environment claim involves sexually charged conduct which was so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive working environment. *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1345 (7th Cir.1995). The focus in a hostile environment claim is not on the victim's economic loss as in the *quid pro quo* cases, but rather on the victim's altered employment conditions resulting from sexually charged conduct. Because the language of Title VII is not limited to economic or tangible discrimination, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63–5, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986), and because Congress intended to eradicate the entire spectrum of disparate treatment of men and women in employment, *id.*, "concrete psychological harm" is not a predicate to maintain a claim of sexual harassment. *Harris v. Forklift Sys., Inc.*, — U.S. —, — – —, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). "A discriminatorily abusive work environment, even one that does not seriously affect

employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Id.* at ——, 114 S.Ct. at 371 (citation omitted).

In *Harris,* the Supreme Court explained that "[t]his standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at ——, 114 S.Ct. at 370. Language which may generate offensive feelings is not enough to affect employment conditions and involve Title VII. "But Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Id.* at ——, 114 S.Ct. at 370; *see Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). Mindful of these parameters, the Court mapped out a two-prong analysis by which to measure the environment in question. *See Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454 (7th Cir.1994) (applying the two-part analysis to those facts). First, the conduct must be subjectively hostile. That is, the victim himself or herself must perceive the environment as abusive; otherwise the conduct would not have actually altered the conditions of employment. *Harris,* —— U.S. at ——, 114 S.Ct. at 370. That Hartman subjectively perceived the role-reversal, or gauntlet, exercise to be hostile is pleaded. First, aware of what the program entailed, he initially was unwilling to attend the CDW. Second, although agreeing to attend the CDW, Hartman was the last male to participate in the exercise, also manifesting his hesitations. Third, he voiced his disapproval before he was coerced to suffer the gauntlet. Fourth, Hartman testified that he was humiliated and that he underwent psychiatric treatment as a result of the CDW.

For the second part of the *Harris* analysis, the court must find the conduct to be objectively hostile. That is, the conduct must be severe enough that a reasonable person would find the environment hostile or abusive. The *Harris* court recognized that the test for whether conduct was objectively hostile is not mathematically precise and added that such an environment can only be determined by looking at the totality of the circumstances. *Id.* at ——, 114 S.Ct. at 371. The Court suggested a non-exhaustive list of factors for the district court to consider: the conduct's frequency and severity; whether the conduct was physically threatening or humiliating; whether it interfered with work performance; and the harm it caused the victim. *Id.* "Although the presence or absence of psychological harm or an unreasonable effect on work performance are relevant and may be considered, 'no single factor is required.'" *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1453 (7th Cir.1994) (quoting *Harris,* —— U.S. at ——, 114 S.Ct. at 371). Hartman has sufficiently pleaded that the exercise was objectively hostile.

At this stage of the pleadings the court must infer all reasonable inferences, and resolve all doubts, in favor of the non-movant. *Associated Milk Producers, Inc. v. Meadow Gold Dairies,* 27 F.3d 268, 270 (7th Cir.1994). Summary judgment criteria are applied with added scrutiny in cases, like the instant case, which involve discrimination because intent and credibility are critical issues. *R.R. Donnelley,* 42 F.3d at 443. Given the forgiving standard for non-movants in such cases, the court cannot find that the environment was not objectively hostile as a matter of law; a trier of fact must decide the issue for this case. First, although it is agreed that participants chided Hartman, there is a factual dispute whether, and to what extent and degree, Hartman was handled while walking between the lines of women. Second, accepting Hartman's well-pleaded facts as true, a reasonable person might find such an environment hostile: an environment where one is ridiculed for being unwilling to participate in an exercise of walking between rows of co-employees, then groped in a sexual manner by the co-employees forming the lines, and later humiliated by subscribing one's name to a graphic of a small, flaccid human penis. The CDW was not a singular occurrence. It was a mandatory three-day program which employees not

only had to attend, but also in which they had to actively take part at a place distant from the home office. The conduct complained of was more than an offensive utterance, or an isolated occurrence. *See Dey*, 28 F.3d at 1456 ("Yet a series of such statements, if sufficiently severe and pervasive, could give rise to an objectively hostile work environment under the *Meritor* standard.") Although the conduct was not physically threatening and the CDW was not on FAA property, the conduct was humiliating objectively and the CDW was a program which Defendant sponsored, Defendant oversaw (in part by FAA supervisors), and for which Defendant paid participating employees their regular salaries and benefits. Furthermore, the program's objective was to influence continuing future behavior of the participants for when they were to return to the Chicago Control Center. Participants were expected to return to the employment environment, as Hartman did, feel the effects of the exercises, and make a practical application of their workshop experiences. Third, because the gauntlet exercise was designed to demonstrate sexual harassment in a "hands on" approach, it is difficult to accept the argument that an exercise created to be sexually harassing was not. The fiction, Hartman contends, took on life. Hartman would not distinguish pretense from reality in terms of the alleged touching of his genitalia. At a minimum, there is a genuine issue as to whether and at what point the simulation became the act. Accordingly, summary judgment is denied as to the claim of sexual harassment.

## IV.

■ The next claim involves religious and racial discrimination. The Complaint submits that the discussions at the CDW were filled with anti-male and anti-religious propaganda. Through the indirect method of proof, an employee may establish a *prima facie* Title VII case by showing that: (1) he belongs to some protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly-situated employees outside his classification more favorably. *Hughes v. Brown,* 20 F.3d 745, 746 (7th

Cir.1994). An employee raises an inference of discrimination once these elements are shown. *Id.*

Defendant argues that, regardless of the comments made, Hartman's employment was in no manner affected. Curiously, Hartman's response ignores both his religious and racial discrimination claims. Furthermore, his Local Rule 12(N) Statement agrees with Defendant's position on the facts and adds nothing to establish that any employment decision was influenced by the comments. "Title VII is not directed against unpleasantness *per se,* but only against discrimination in the conditions of employment." *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 708 (7th Cir.1995) (quoting *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994)). The court finds that any alleged comments made were ignorant and demeaning, but not sufficient, within the context of the program, to create a genuine issue of fact regarding his employment. Accordingly, summary judgment is granted as to Hartman's religious and racial discrimination claims.

## V.

■ Hartman's last claim is that Defendant retaliated against him for having filed an EEOC complaint. It is unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). Again, the indirect method of proof is applicable. A *prima facie* case of retaliation consists of three elements: (1) the employee took part in a statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) there is a causal link between the statutory expression and adverse action. *Dunning v. Simmons Airlines, Inc.,* 62 F.3d 863, 868–69 (7th Cir. 1995); *Alexander v. Gerhardt Enterprises, Inc.,* 40 F.3d 187, 195 (7th Cir.1994).

■ In order to establish that he suffered an adverse employment action, Hartman submits that he was not granted a "quality step increase" for certain periods. Once an employee establishes a *prima facie*

case, the burden shifts to the employer to produce, not prove, a legitimate reason for termination. *Alexander,* 40 F.3d at 195. After the employer submits a lawful reason for discharging the employee, the burden shifts back to the employee to prove by a preponderance of the evidence that the employer's reasons were pretextual. *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 522 (7th Cir.1994). Even if the court were to recognize that the *prima facie* elements were met, Hartman fails to rebut Defendant's legitimate reason for its decision not to grant the increases. Defendant's lawful reason for denying the step increases related to Hartman's work performance. (Def.'s 12(M) ¶ 61.) Again, Hartman's responsive memorandum is without argument on this point. But, in his Local Rule 12(N) Statement Hartman submits, "Plaintiff does not dispute the statement regarding Mr. Burke's reasons for plaintiff not receiving quality step increases but does dispute the actual reason for plaintiff's failure to receive quality step increases." (Pl.'s 12(N) ¶ 61.) This is not enough.

First, as a procedural concern, Hartman's assertion is unsupported. Therefore, the assertion fails to satisfy Local Rule 12 as a proper denial and Defendant's proffered legitimate reason must be accepted as fact. *Valenti v. Qualex, Inc.,* 970 F.2d 363, 369 (7th Cir.1992) (holding that a flat denial to a statement of fact under Local Rule 12 without reference to supporting materials has no standing under the Local Rule); *Parks v. University of Chicago Hosp.,* 896 F.Supp. 775, 779 (N.D.Ill.1995). Second, even if the 12(N) Statement were supported by, *e.g.,* his affidavit, the bald assertion would not likely serve as proof of pretext. Some evidence is needed. *See Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995). "Inferences and opinions must be grounded on more than flights of fancy, speculation, hunches, intuitions or rumors and discrimination law would be unmanageable if disgruntled employees ... could defeat summary judgment by affidavits speculating about the defendant's motives." *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1146 (7th Cir.1994). Accordingly, since Hartman did not cast any doubt on Defendant's proffered reason (indeed, Hartman's response accepts Defendant's legiti-

mate nondiscriminatory reason), summary judgment is appropriate for this claim.

### VI.

In conclusion, Defendant's motion for summary judgment is denied as to Hartman's claim of sexual harassment, and is granted as to the claims of racial and religious discrimination, and retaliation.

IT IS SO ORDERED.