Lynda CARLTON, Plaintiff,

v.

**Jack RYAN, Acting Chief Executive Officer of the Resolution Trust Corporation, Defendant.**

No. 94 C 3998.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 26, 1996.

---

**834**

Richard William Young, Amy H. Kohn, Ina L. Turner, Gardner, Carton & Douglas, Chicago, IL, for plaintiff.

Brian R. Havey, Kathryn Ann Kelly, United States Attorney's Office, Chicago, IL, for Jack Ryan.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court is the motion for summary judgment of Defendant Jack Ryan, the Chief Executive Officer of the Resolution Trust Corporation ("RTC"). The RTC is an agency of the Federal Government which manages the affairs of failed financial institutions. 12 U.S.C. § 1441a(b). Plaintiff Lynda Carlton brings this suit pursuant to Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–16(e). For the reasons that follow, the motion is granted.

### I.

█ Carlton claims she is the victim of discrimination at the hands of a federal government employer. Her employer, the RTC, explains that Carlton's problems on the job resulted from her own cantankerous attitude and incompetent conduct, and nothing more. Litigants should be reminded that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Kahn v. United States Secretary of Labor,* 64 F.3d 271, 280 (7th Cir. 1995) (quoting *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992)).

In her *pro se* Complaint, Carlton protests that the RTC (and four other defendants who were dismissed later) discriminated against her due to her race and gender, and retaliated against her because she filed a charge with the Equal Employment Opportunity Commission ("EEOC"). Since that time, she has been appointed counsel, who have performed their duty professionally. The RTC filed a motion for summary judgment and a Local Rule 12(M) Statement to which appointed counsel responded and filed a Local Rule 12(N) Statement. Based on these submissions, the court first retells the undisputed facts pertaining to the cardinal dates, then some facts concerning Carlton's work with the RTC.

Carlton, a certified public accountant, began working for the Federal Deposit Insurance Corporation on August 13, 1990, as a temporary accountant. Her temporary position was to last one year, concluding on August 12, 1991. In October 1990, Carlton filed an EEOC charge which the parties settled on December 14, 1990. In December 1990, Carlton's division was placed under the jurisdiction of the RTC. Carlton was made a group leader in the accounts payable unit. On February 19, 1991, Carlton petitioned to reopen her EEOC charge. In April 1991, the RTC tended to Carlton a memorandum dated March 18, 1991, and entitled "Plan for Corrective Action." The memorandum recognized and addressed her poor performance and attitude problems. The next day, April 4, 1991, Carlton called in sick. She returned over two months later on June 17, 1991, as a part-time employee, and she returned to full-time duty a month later. Carlton had been at work full-time for one week when she was informed of the decision not to renew her temporary appointment.

Carlton worked for the division which would assess the liabilities and assets of a failed financial institution and then create a financial statement. The endeavor normally took a few days and was termed the "pro forma" process. Carlton took part in the

process three times. Her first experience with closing a failed financial institution was in August 1990. At that time, she was an assistant to a pro forma manager and reviewed "settlement jackets." The manager reported that Carlton was not ready to become a pro forma manager. On September 7, 1990, Carlton was sent on a second closing as an assistant. Similarly, that manager testified that he had reservations about her abilities to become a pro forma manager. Carlton's third closing began September 21, 1990.

The record is replete with the reviews of those who examined this matter. After the end of her one-year term, on August 15, 1991, Carlton filed yet another charge of discrimination with the EEOC. The RTC hired an outside contractor to investigate her accusations of discrimination. Then, on December 8 and 11, 1992, an administrative law judge ("ALJ") conducted hearings wherein nine witnesses testified. In a thirty-one page recommendation filed on March 30, 1993, the ALJ endorsed a finding of no discrimination as to Carlton's charges based on gender, race, and reprisal. Next, on July 6, 1993, the RTC issued a five page decision adopting the ALJ's recommendation. Carlton appealed to the EEOC. On May 26, 1994, the EEOC issued its own decision which consisted of twelve pages and affirmed the RTC's conclusions. Carlton filed this federal case on June 30, 1994, within the ninety-day requirement of 42 U.S.C. § 2000e–5(f)(1). See Sanders v. Venture Stores, Inc., 56 F.3d 771, 775 (7th Cir.1995).

Carlton did not dispute many of the most damaging statements submitted by the RTC, only the characterizations attached to them. Throughout her employment, Carlton's attitude and performance were uniformly criticized by the RTC and non-RTC personnel. Non–RTC people with whom Carlton worked testified that Carlton was difficult, disorganized, inconsiderate, and rude. RTC's regional financial officer evaluated Carlton, commented that she had poor interpersonal skills, and wrote:

In the six years that I have been responsible for directing well over 300 bank closings, I have never encountered the complaints and criticisms on any one DACS professional that have surfaced as a result of this one closing you were in charge of. I find the comments made by professional individuals outside the Corporation as well as those of other Divisions as embarrassing and disturbing to the reputation of our organization and the staff of professionals we entrust to handle Pro Forma duties.

(Def.'s Ex. 22.) At one closing, a manager removed Carlton from her assignment because of the problems she was causing. The manager had never removed someone in over thirty closings. She testified that Carlton caused the staff to reach levels of frustration that she had not encountered before. On her third closing, the pro forma manager at that time reported that Carlton lacked enthusiasm and organization (Pl.'s ex. 4 at 39), and did not complete some of her assigned tasks (id. at 41).

On another occasion, a regional accountant assigned to assist and supervise Carlton reported that other employees complained about the way Carlton dealt with them. The regional accountant observed how Carlton was abrupt and short with the staff, and acted superior to them. She added that a Pro Forma Manager must demonstrate professionalism and foster goodwill, and that Carlton was not able to act as such. In fact, Carlton's attitude and interpersonal communication problems were the worst that the accountant had seen on forty-eight closings. Similarly, a claims and settlement specialist found Carlton to be uncooperative, unprofessional, difficult to work with, and rude. And those who worked for Carlton agreed that she was disorganized, difficult to work for, not easy to talk with, and treated them terribly.

Carlton's lack of professionalism extended beyond incivility. Her supervisor once penned a memorandum to her demanding an explanation after he discovered that she misrepresented being current with her work. Three days later, the same supervisor appraised her work in a memorandum and explained that Carlton acted "impudently" towards him, indifferently to his requests, dilatory, "aloof," "discourteous,"

"abusive," "insolent," and at one point "blatantly refused" a request. He wrote:

> She resents authority and deliberately antagonizes her fellow workers. The accounts payable unit could be run more efficiently and effectively without her. She appears unwilling to pitch in to get the job done. Her attitude and performance are having a negative affect on the morale of the unit an also the entire DACS division.

(Def.'s Ex. 33.)

In Carlton's Rule 12(N) Statement, she adds fifty-two paragraphs of assertions. In the Statement, Carlton recognizes that she received training while on the job, but she argues that the training was substandard. Carlton argues that others received formal training which she did not because of her race. In support, she submits a travel voucher which lists expenses incurred for a "Trip to Lake Central Consolidated office for Pro Forma Training." (Pl.'s Ex. 2.) She also argues that Carlton was the only accountant in the office not to be renewed.

One of the central factual disputes involves the existence and extent of training. Carlton asserts that she did not receive the same amount of training as other employees and that, as a result, she was not able to perform as well. Her substandard performance, argues Carlton in effect, was not her fault. The RTC responds that Carlton is not entitled to a renewed appointment, that there was no formal training, that she received the same amount of informal training as the rest, and that she was not rehired after her one-year appointment because she performed the job poorly.

Carlton also complains that the criticisms which others documented in memoranda were not communicated to her early enough. Regarding her interaction with others, Carlton refers to the testimony of Tim Hobbs. In answer to whether Hobbs witnessed Carlton interact poorly with others, he responded, "Nothing that I can recollect at this time five years later." (Pl.'s Ex. 1 at 47.) Beyond that, the assertions simply list, and try to explain away, a number of petty squabbles and pugnacious interactions between Carlton and others.

## II.

To survive a motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Russell v. Acme–Evans Co.,* 51 F.3d 64, 67 (7th Cir. 1995). Summary judgment is not a discretionary remedy and must be granted when the movant is entitled to it as a matter of law. *Anderson v. P.A. Radocy & Sons, Inc.,* 67 F.3d 619, 621 (7th Cir.1995). In the instant case, the court finds that there are no material issues of fact.

Neither party appropriately identifies the specific wrong connected to the discrimination in this case—i.e., whether the harm was the failure to promote, the failure to rehire, or the failure to train. Carlton was a pro forma manager for a time and practically admits that she did not complete her assignments as a manager well. But she counters that her lack of ability was a result of her lack of training; a formal training that she says was offered to others.[1]

To prove a Title VII claim of racial discrimination, a plaintiff may establish that the employer had a discriminatory intent in either of two ways. The plaintiff may establish his case either directly, through direct or circumstantial evidence, or indirectly, through the burden shifting method commonly referred to as the *McDonnell Douglas* test. *Kormoczy v. Secretary, Dept. of Housing & Urban Dev.,* 53 F.3d 821, 823–24 (7th Cir.1995). Carlton attempts to prove her claims through the indirect method. Through the indirect method of proof, an employee may establish a *prima facie* Title VII case by showing that: (1) she belongs to some protected class; (2) she performed her

---

1. The court treats her assertion that she was not trained as support to discredit the RTC's reason for not rehiring her. The failure to train *per se* was not pleaded as a separate wrong which could support a discrimination claim. The failure to rehire, however, was pleaded and is considered the adverse employment action underlying the racial discrimination claim.

job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated similarly-situated employees outside her classification more favorably. *Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir.1994). An employee raises a rebuttable presumption of discrimination once these elements are shown. For the employer, "the burden of production [—not proof—] then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 377–78 (7th Cir.1995). If the employer offers a legitimate explanation, then the presumption of discrimination dissolves and the burden shifts back to the plaintiff to prove that the employer's proffered reason was pretextual. *Id.* The court will forego a discussion on the *prima facie* elements and address whether the RTC's nondiscriminatory reason for its decision not to rehire was pretextual.

The RTC offers a legitimate reason for its decision not to rehire—that Carlton was an insufferable employee. Again, Carlton argues that, although she could not perform well as a pro forma manager, the RTC hampered her from doing so when it refused to train her as it had trained other employees outside her protected minority classification. In the instant case, the following distinction makes the difference.

What must be separated is the skill to perform the pro forma task technically, and the skill to carry out the task with others generally. If a pro forma manager (or any position which necessarily involves interaction with, or supervision of, other human beings) does not possess both skills, then it may be said that the manager cannot perform well. In this case, Carlton focuses on her inability to master the technical aspects of the pro forma manager position and explains that it is the fault of the RTC for not training her. However, the undisputed facts manifest that her most serious deficiencies, the deficiencies for which she was not re-hired, were her inability to manage people. Regardless of whether she could do the specific tasks involved, Carlton could not peaceably interact with those below her, above her, or around her in the RTC and the businesses related to the RTC.

In response, Carlton cites to an unreported case which suggests that the RTC's failure to train relates to her dissatisfaction with the position. *See Vogl v. Arrow Pattern & Foundry Co.,* No. 93 C 3846, 1994 WL 53776 (N.D.Ill. Feb. 18, 1994). The conclusion she expects the court to draw is that her lack of technical training frustrated her so that she developed a contentious personality, a problem which the RTC furthered by not offering feedback on her performance. Yet, as a matter of law, employers do not have to hold their employees' hands. That Carlton was frustrated by her own lack of technical skills or did not receive the feedback she desired does not mean that the RTC had to excuse her behavior toward others.

Furthermore, Carlton complains that the RTC tendered to her performance evaluations late which violated their former settlement agreement. However, any alleged breach is not pleaded in her complaint. Accordingly, Carlton has not satisfied her burden of proving that the RTC treated her differently (which is pleaded as a conspiracy to discriminate) in the hopes of making her so disgruntled that the RTC could justify not renewing her temporary appointment.

### III.

Carlton pleads other varieties of discrimination as well. Carlton claims gender discrimination in the form of sexual harassment. Her claim is based on a passing remarks that a supervisor made inappropriate sexual remarks. Her factual assertions are that a supervisor invited her to his room in a suggestive manner, that the supervisor required her to take meal breaks with the employees within her pro forma group, and that she generally felt uncomfortable. This is not enough to rise to the level of a constitutional violation of gender discrimination. *See McCarthy v. Kemper Life Ins. Cos.,* 735 F.Supp. 251, 253 (N.D.Ill.1989) (stray remarks are direct evidence of intent only where they are made by the decision-maker and are related directly to the employment decision at issue). The court recently outlined the two-pronged analysis of a sexually hostile environment claim in *Hartman v. Pena,* 914 F.Supp. 225 (N.D.Ill.1996). First,

the conduct must be subjectively hostile. That is, the victim himself or herself must perceive the environment as abusive; otherwise the conduct would not have actually altered the conditions of employment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). That Carlton subjectively perceived the environment to be hostile is suspect. Second, the court must find the conduct to be objectively hostile. That is, the conduct must be severe enough that a reasonable person would find the environment hostile or abusive. The court finds that the conduct alleged is not objectively hostile. Accordingly, Carlton's gender discrimination claim falls.

 Next, Carlton claims that the RTC discriminated against her contractually in violation of 42 U.S.C. § 1981. This claim fails for a number of reasons. First, this claim is not in Carlton's *pro se* Complaint. Second, the only argument on this point comes in one sentence and a footnote. Third, as the RTC suggests, § 1981 does not apply to the federal government. *Espinueva v. Garrett*, 895 F.2d 1164, 1165 (7th Cir.1990) ("Section 1981 does not apply to employment discrimination cases involving the federal government....") (citing *Brown v. General Serv. Admin.*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)); *see also Holloway v. Bentsen*, 870 F.Supp. 898, 900 (N.D.Ind. 1994). Accordingly, Carlton's § 1981 claim is dismissed as well.

 Lastly, Carlton's claim of retaliation is unfounded. It is unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). Because Carlton has no direct evidence, the indirect method of proof is applicable at this juncture as well. A *prima facie* case of retaliation consists of three elements: (1) the employee took part in a statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) there is a causal link between the statutory expression and adverse action. *Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863, 868–69 (7th Cir.1995); *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994).

The protected activity alleged was the filing of her first EEOC charge. The alleged adverse employment action taken includes that a supervisor wrote a "caustic review," that the RTC sought out evaluations which would reflect poorly on her performance, that Carlton became a scapegoat, that the RTC encouraged others to circumvent her authority, and that her contract was not renewed. Of those, the only supported assertion is that her contract was not renewed. Regarding the last element, Carlton argues that the causal link may be found due to the short amount of time between the filing and the refusal to rehire. That is, Carlton wishes the court to find that her October 1990 EEOC charge (which was settled December 1990 and re-opened in February 1991) is close in time to July 26, 1991, when the RTC informed her that she would not be rehired. The court is not persuaded. *See Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708–09 (7th Cir.1995). However, even if the court were to find that Carlton established all three *prima facie* elements, Carlton cannot satisfy her burden to refute the RTC's legitimate reason for not renewing her contract. *See supra.* Accordingly, the court dismisses Carlton's claim of retaliation.

### IV.

For the foregoing reasons, the court grants the RTC's motion for summary judgment as to all claims.

IT IS SO ORDERED.