Brenda POKOL, Plaintiff,

v.

**E.I. DU PONT DE NEMOURS AND CO., INC., et al., Defendants.**

Civil Action No. 96–626(AJL).

United States District Court, D. New Jersey.

March 20, 1997.

James P. Madden, Klausner & Hunter, Somerville, NJ, for Plaintiff.

Steven W. Suflas, Archer & Greiner, Haddonfield, NJ, for Defendants.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiff Brenda Pokol ("Pokol") against the defendant E.I. du Pont de Nemours and Company, Inc. total and permanent disability plan (the "DuPont Plan"), John Doe, the designated unknown defendant intended to be administrator to the DuPont Plan, John Does 1 through 6, designated unknown defendants intending to be the Board of Benefits and Pension of the DuPont Plan, and E.I. du Pont de Nemours and Company, Inc., the defendant fiduciary of the Dupont Plan ("DuPont") (collectively, the "Defendants"). Jurisdiction is alleged pursuant to 29 U.S.C. § 1132(e).

Pokol seeks to overturn a denial of disability benefits by her former employer, DuPont. Pokol seeks, *inter alia*, damages in the amount she would have received had her initial application for total and permanent disability benefits been granted, as well as a declaratory order holding Defendants responsible for future total and permanent disability benefits.

On 1 February 1996, Pokol filed a complaint (the "Complaint") in this court.[1] DuPont submitted, pursuant to Rule 12N, Appendix N ("Rule 12N") of the General Rules for the District of New Jersey, a motion for summary judgment (the "Motion for Sum-

---

1. Count One of the Complaint alleges DuPont wrongfully denied Pokol total and permanent disability benefits under the DuPont Plan. Complaint, ¶ 15. Counts Two through Five allege violations of the New Jersey Law against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et. seq.* At a scheduling conference held on 11 June 1996, it was agreed that trial in this matter would be held only on the ERISA claims. *See* Minutes of 11 June 1996 Scheduling Conference. The parties agreed to submit a consent order (the "Consent Order") voluntarily dismissing the claims pursuant to the NJLAD. Moving Brief at 1, n. 1.

To date, no Consent Order has been submitted. Nevertheless, the state law claims that comprise Counts Two through Five are dismissed without prejudice pursuant to Section 1367(c)(3) of Title 28, which states,

The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); see *also Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966)); *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284–85 (3d Cir.1993). Diversity jurisdiction has not been alleged. *See* Complaint, Jurisdiction, ¶ 1.

mary Judgment").[2] For the reasons set forth below, the Motion for Summary Judgment is granted.

*Facts* [3]

A. *Parties*

1. *Pokol*

a. *Employment History*

Pokol began working at Dupont on or about 23 April 1979. Complaint, First Count, ¶ 1. Pokol was employed as a machine operator at the DuPont printing and publishing facility located in Parlin, New Jersey. *See* 22 June 1993 Medical Evaluation Report ("22 June 1993 Medical Report"), attached as Exhibit 9 to Defendants' Appendix. Pokol was a participant and beneficiary of the DuPont Plan, an employee welfare benefit plan falling within the intent and coverage of Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1). Complaint, Venue and Parties, ¶ 3. Pokol applied for benefits pursuant to the Dupont Plan in 1993. Complaint, First Count, ¶¶ 6-8. The application and subsequent appeals for benefits were denied. *Id.*, ¶¶ 8, 11, 14.

Pokol suffered from numerous medical problems and was frequently absent from work. Between 1 January 1989 and 25 November 1992, Pokol was out of work for approximately 464 days. Ramirez Affidavit, ¶ 11. Pokol was absent from work at DuPont from 16 February 1993, Ramirez Affidavit, ¶ 11, until she was terminated by DuPont on or about 15 February 1994. Complaint, First Count, ¶ 9.

b. *Medical History*

Pokol began suffering back and arm pain in 1985 while she was a machine operator at DuPont. Complaint, First Count, ¶ 2. In 1990, Pokol suffered injuries in a car accident. *Id.*

Pokol was hospitalized in December of 1991 due to cervical symptoms and was diagnosed with Spondylosis with a herniated disc at C5–C6. *Id.* Pokol underwent a dissectomy and fusion of the herniated discs. *Id.*

Pokol underwent surgery in May 1992 "to excise a granuloma of a stitch in her neck which was left from a prior surgery." *Id.*, ¶ 3. In December 1992, Pokol underwent an MRI which revealed a disc desiccation at L2–L4. *Id.* Pokol was treated by an orthopedist for epicondylitis in the left upper extremity and a neurologist which suggested the presence of fibromyalgia. *Id.*, ¶ 4. Pokol was

---

2. In support of the Motion for Summary Judgment, DuPont submitted: Notice of Motion for Summary Judgment; Defendant's Brief in Support of Motion for Summary Judgment ("Moving Brief"); Statement of Material Undisputed Facts Pursuant to General Rule 12G in Support of Summary Judgment ("DuPont 12G Statement"); Appendix to Statement of Material Undisputed Facts Pursuant to Local Rule 12(G) in Support of Motion for Summary Judgment ("Defendants' Appendix"), with Exhibits 1 through 25 attached; Affidavit of Benjamin Ramirez ("Ramirez Affidavit"); Affidavit of Jerry H. Brenner ("Brenner Affidavit"); Defendant's Reply Brief to Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Reply Brief").

In opposition to the Motion for Summary Judgment, Pokol submitted: Brief in Opposition to the Motion for Summary Judgment ("Opposition Brief"); Certification of James P. Madden ("Madden Certification"), with Exhibits A through F attached.

3. The Opposition Brief states that "[a]s discovery is not yet completed, [Pokol] has attempted to set forth a Statement of Facts primarily based upon the allegations in her Complaint. Any other rele-

vant facts will be discussed in the body of [the Opposition Brief]." Opposition Brief at 3.

> Despite this contention, Pokol did not submit an affidavit pursuant to Fed.R.Civ.P. 56(f), which states:
>> Should it appear from the affidavit of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit ... discovery to be had or may make such other order as is just.
>
> Fed.R.Civ.P. 56(f). Rule 56(f) expressly requires the submission of an affidavit "to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit." *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 510–11 (3d Cir.1994) (citations and internal quotations omitted). In the absence of such an affidavit, the fact that discovery has not been completed will not preclude summary judgment.

additionally diagnosed with Post–Traumatic Stress Disorder by a psychologist in March 1993. *Id.*, ¶ 5.

## 2. *The DuPont Plan*

### a. *Purpose*

The DuPont Plan was adopted on 28 February 1978 and amended on 1 October 1991. *See* DuPont Plan, attached as Exhibit 3 to Defendants' Appendix. The stated purpose of the DuPont Plan is:

> To protect eligible employees against substantial loss of earnings in the event of total and permanent disability resulting from injury or disease by supplementing benefits payable under other Company and government-sponsored programs.

*See* DuPont Plan at 1.

The DuPont Plan defines "totally and permanently disabled" as follows:

> An individual shall be considered "totally and permanently disabled" if the Board of Benefits and Pensions [ (the "Board") ] finds that he is totally disabled by injuries or disease and presumably will be totally and permanently prevented from pursuing any gainful occupation. . . .

> The determination of whether the employee is totally or permanently disabled shall be made on the basis of his condition immediately prior to his termination of service with the company, and an employee who becomes totally and permanently disabled after termination of service with the company will not qualify for benefits under this [DuPont Plan].

*See* DuPont Plan at 2.

DuPont delegated the administration of the DuPont Plan to, and vested all authority in, the Board, which is granted discretion in conducting its activities under the DuPont Plan:

> The Board may adopt such rules, or delegate to one or more persons its authority to make initial determination, as it may deem necessary for the proper administration of the [DuPont Plan]. The [Board] retains discretionary authority to determine eligibility for benefits hereunder and to construe the terms and conditions of the [DuPont Plan]. The decision of the Board in all matters involving the interpretation and application of this [DuPont Plan] shall be final.

*See* DuPont Plan at 8.

### b. *Procedures for Processing Benefits Under the DuPont Plan*

The Board follows the same procedure for each case arising under the DuPont Plan. Brenner Affidavit, ¶ 7. The Board appoints delegates from DuPont's Human Resources Department (the "Human Resources Delegate") for the purpose of processing certain applications under various Dupont benefit plans, including the instant DuPont Plan. *Id.* Responsibility for Pokol's application for total and permanent disability benefits was at times delegated to Human Resources Delegates Herbert W. Watson ("Watson") and Carol I. Killeen ("Killeen"). *Id.*

Medical information submitted in support of an application for benefits is reviewed by a member of DuPont's Corporate Medical Division, who also functions as a delegate of the Board (the "Medical Delegate"). *Id.*, ¶ 8. In the case of Pokol, the Medical Delegate was Benjamin Ramirez, M.D. ("Dr.Ramirez"). *Id.*

When an application for total and permanent disability benefits is received, one of the Human Resources Delegates processes the application. *Id.*, ¶ 9. The Medical Delegate reviews the matter and makes the initial determination. *Id.* The Human Resources Delegate than reviews the determination and informs the claimant of the initial determination in writing. *Id.* If benefits are denied, the letter advises the applicant of the reasons for the denial, specifying the provision from the DuPont Plan on which the denial is based and citing the information reviewed. *Id.* This letter also advises the applicant of the right to appeal the denial to the three-member Board. *Id.* At all times relevant to this matter, the members of the Board were Chairman S.A. Harrison and Members J.H. Brenner, Esq. and T.B. Storer. *Id.*, ¶ 6.

As part of the appeal process, the applicant is permitted to submit additional information in support of the appeal. *Id.* ¶ 10. Any additional medical information is again

reviewed by the Medical Delegate, who prepares a summary for the Board. *Id.* The Human Resources Delegate assembles, organizes and forwards the materials to the Board for its review. *Id.* The Board considers the appeal, meets to discuss the application, usually with the Medical Delegate and the Human Resources Delegate in attendance, and issues a final determination. *Id.* Minutes of the meeting are sent to the applicant. *Id.* The Board has overruled the Medical Delegates on several occasions. *Id.,* ¶ 20.

### B. *Pokol Application for Total and Permanent Disability Benefits*

Pokol submitted an application for total and permanent disability benefits pursuant to the DuPont Plan in mid 1993. Ramirez Affidavit, ¶ 10. Pokol's initial application for benefits (the "Initial Application") contained various medical reports and determinations addressing her physical and psychological health, including

1. 8 June 1993 Letter from Dr. A.S. Lichtbroun ("Dr. Lichtbroun") to Dr. M. Deltieure ("Dr. Deltieure") (the "8 June 1993 Letter"), attached as Exhibit 11 to Defendants' Appendix. The 8 June 1993 Letter stated that, Dr. Lichtbroun "feel[s] she is totally disabled from her current occupation and is unable to lift more than five pounds." Ramirez Affidavit, ¶ 14. It recites subjective symptoms and does not state the etiology or cause of her symptoms. *Id.*

2. 6 May 1993 Psychological evaluation from Dr. N. Fiedler, Ph.D. ("Dr. Fiedler") ("6 May 1993 Psychological Evaluation"), attached as Exhibit 12 to Defendants' Appendix. The 6 May 1993 Psychological Evaluation stated that "her pain stems from a combination of physical factors that are amplified and exacerbated by panic attacks and depression. Future job placement will depend on [Pokol's] ability to gain both physical and psychological strength. Rather than be totally disabled, it would be better to place her in a job she can accomplish (e.g. reception or other light duty jobs)." Ramirez Affidavit, ¶ 15.

3. 11 March 1993 Letter from Dr. F. Rehman ("Dr. Rehman") to Dr. J. Renda ("Dr. Renda") ("11 March 1993 Letter"), attached as Exhibit 13 to Defendants' Appendix.

4. 18 February 1993 Letter from Dr. Deltieure to Dr. Renda ("18 February 1993 Letter"), attached as Exhibit 14 to Defendant's Appendix.

5. 4 March 1993 Handwritten Letter from Dr. Renda to Dr. Deltieure ("4 March 1993 Letter"), attached as Exhibit 15 to Defendants' Appendix. The 4 March 1993 Letter contained a diagnosis of "myositis and spasm," which are temporary, not permanent, conditions of inflammation. Ramirez Affidavit, ¶ 16. The 4 March 1993 Letter was unaccompanied by objective medical evidence to support the opinion. *Id.* Dr. Renda concluded that Pokol "is not a candidate for her present job description." *Id.*

6. 2 June 1993 Handwritten Letter from Dr. Renda to Dr. Deltieure ("2 June 1993 Letter"), attached as Exhibit 16 to Defendants' Appendix.

7. 13 April 1993 Letter from Dr. Rehman to Dr. Deltieure ("13 April 1993 Letter"), attached as Exhibit 17 to Defendants' Appendix. The 13 April 1993 Letter states, "As a result, I feel that the patient may not be able to do her duties as a machinist but may be capable of other jobs not requiring any heavy lifting, pushing, or pulling." Ramirez Affidavit, ¶ 18.

8. 1 April 1993 Report from Dr. E. Schlesinger ("Dr. Schlesinger") ("1 April 1993 Schlesinger Report"), attached as Exhibit 18 to Defendants' Appendix. This report did not indicate Pokol was suffering from major depression or any other permanent psychiatric diagnosis. Ramirez Affidavit, ¶ 19.

9. 25 June 1993 Medical Evaluation Report by Dr. Deltieure ("25 June 1993 Medical Report"), attached as Exhibit

9 to Defendants' Appendix. This report stated that the examiner found no significant "pertinent physical findings" based upon her physical examination of Pokol. Ramirez Affidavit, ¶ 20.

*See* Ramirez Affidavit, ¶¶ 12–20. Dr. Ramirez reviewed these items and concluded Pokol failed to submit any objective medical information to establish that she was totally and permanently disabled. *Id.*, ¶ 21. Dr. Ramirez recommended Pokol's Initial Application for benefits be denied. *Id.*

The recommendation was adopted by Human Resources Delegate Watson, and the Board subsequently denied Pokol's Initial Application. Brenner Affidavit, ¶ 12. The decision was communicated to Pokol in a letter from Watson, dated 17 September 1993, (the "17 September 1993 Letter"). *Id.*, ¶ 13; 17 September 1993 Letter, attached as Exhibit 4 to Defendants' Appendix. The 17 September 1993 Letter listed the items of medical evidence reviewed[4] and informed Pokol of her right to appeal. *Id.*

Pokol submitted additional medical information for consideration of total and permanent disability benefits in response to the 17 September 1993 Letter ("Supplemental Application"). Ramirez Affidavit, ¶ 23. This information consisted of

1. 18 October 1993 Letter from Dr. Renda to Congressman F. Pallone, Jr. ("Congressman Pallone"), attaching the 11 March 1993 Letter of Dr. Rehman to Dr. Renda, 13 September 1993 Handwritten Letter to Congressman Pallone, and the 6 December 1993 Letter from Congressman Pallone to Barbara Kaczmarex ("Kaczmarex") at DuPont. ("18 October 1993 Letter, With Attachments") *See* Exhibit 20, attached to Defendants' Appendix.

2. 11 March 1993 Letter from Dr. Rehman to Dr. Renda ("11 March 1993 Letter"), attached as Exhibit 13 and Exhibit 20 to Defendants' Appendix.

3. 12 July 1993 Letter from Dr. Lichtbroun to Dr. Renda ("12 July 1993

Letter"), attached as Exhibit 21 to Defendants' Appendix.

Ramirez Affidavit, ¶ 23. Dr. Ramirez reviewed the medical submissions comprising the Supplemental Application, concluded the additional evidence did not change his initial determination and recommended the Supplemental Application be denied. *Id.*, ¶¶ 23–24.

Pokol was informed of the decision by letter from Human Resources Delegate, Killeen, dated 6 December 1993 (the 6 December 1993 Letter). *Id.*, ¶ 24.

Pokol filed a formal appeal ("Appeal") and submitted additional medical information. Brenner Affidavit, ¶ 15. The additional medical information included

1. 17 January 1994 Letter from Dr. S.E. Hodes ("Dr. Hodes") (the "17 January 1994 Letter"), attached as Exhibit 22 to Defendants' Affidavit. The 17 January 1994 Letter did not state an opinion as to whether Pokol was totally or permanently disabled. Ramirez Affidavit, ¶ 26.

2. 2 February 1994 Handwritten Letter from Dr. Lichtbroun to Dr. Deltieure (the "2 February 1994 Letter"), attached as Exhibit 23 to Defendants' Appendix.

3. 14 February 1994 Medical Restrictions/Disposition Report by Dr. Deltieure (the "14 February 1994 Medical Report"), attached as Exhibit 24 to Defendants' Appendix. The 14 February 1994 Medical Report concluded that Pokol could return to work with certain restrictions. Ramirez Affidavit, ¶ 28.

4. 22 January 1994 "Final Report—Surgical Pathology Report" from Dr. H.G. Schriever ("Dr. Schriever") (the "22 January 1994 Surgical Pathology Report"), attached as Exhibit 25 to Defendants' Appendix.

5. 7 March 1994 "Medical Evaluation Report" by Dr. Deltieure (the "7 March 1994 Report"), attached as Exhibit 10 to Defendants' Appendix. The 7 March 1994 Report concluded that

---

4. The 2 June 1993 Letter was not listed as an item reviewed in the 17 September 1993 Letter.

Pokol was able to work with certain restrictions. Ramirez Affidavit, ¶ 29. *See* Ramirez Affidavit, ¶ 25. Dr. Ramirez reviewed all the materials, including previously submitted materials, Ramirez Affidavit, ¶¶ 25–29, and recommended the denial of Pokol's application for total and permanent disability benefits in the Appeal. *Id.,* ¶ 30. Dr. Ramirez prepared a summary report (the "Summary Report") of his findings for the Board's consideration. *Id.,* ¶ 30; *see also* Summary Report, attached as Exhibit 6 to Defendants' Appendix.

The delegates assembled the materials relating to Pokol's application. Brenner Affidavit, ¶ 15. The materials were submitted to the Board for review. *Id.*

On 10 May 1994, the Board formally considered and denied the Appeal. *Id.,* ¶ 17. The decision was memorialized in minutes prepared by the Board secretary. *Id.,* ¶ 18. A letter, dated 10 June 1994 (the "10 June 1994 Letter"), was sent to Pokol by Killeen informing her of the denial of her application for total and permanent disability benefits. *Id.,* ¶ 19. The 10 June 1994 Letter notified Pokol that her appeal rights with DuPont, as required by ERISA, had been exhausted. *See* 10 June 1994 Letter, attached as Exhibit 8 to Defendants' Appendix.

### C. *Administrative Law Proceedings*

On 14 May 1994, between Pokol's Initial Application for benefits and her Appeal, Administrative Law Judge Irving Fliegler ("Judge Fliegler") held that Pokol was entitled to disability insurance benefits under the Social Security Act, retroactive to 15 February 1993. *See* 14 May 1994 Administrative Law Decision ("Administrative Law Decision"), attached as Exhibit F to Madden Certification.

### D. *Subsequent Events*

Pokol retained counsel ("Counsel for Pokol") who sent a letter to Killeen, dated 26 October 1994 ("26 October 1994 Letter"). Complaint, First Count, ¶ 12. The 26 October 1994 Letter advised DuPont that Pokol had been deemed totally and permanently disabled by the Social Security Association. *Id.,* ¶ 12.

After receiving no reply, Counsel for Pokol again sent correspondence, dated 2 December 1994 ("2 December 1994 Letter"), urging reversal of the denial of benefits. *Id.* ¶ 13. By letter, dated 19 December 1994, Killeen informed Counsel for Pokol that the benefits were again denied. *Id.,* ¶ 14.

### *Discussion*

#### A. *Standard of Review for Summary Judgment Motions*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [the Defendants] entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether DuPont is entitled to judgment as a matter of law. A district court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir. 1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,*

465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See Di-Biase v. SmithKline Beecham Corp.*, 48 F.3d 719, 724 (3d Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); see *also Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States*, 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554; *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329 (3d Cir.1995) ("[w]hen the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial"). Once the movant demonstrates an essential element of the nonmovant's case is lacking, "the nonmovant must then respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes v. Perskie*, 32 F.3d 759, 762 & n. 1 (3d Cir.1994) (citation omitted). *See also Anderson*, 477 U.S. at 247, 106 S.Ct. at 2509–10; *Brewer*, 72 F.3d at 330; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco*, 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56 (nonmovant must "do more than simply show that there is some

metaphysical doubt as to the material facts"); *Gomez v. Allegheny Health Serv., Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *accord Siegel*, 54 F.3d at 1130–31; *Nevets C.M., Inc., v. Nissho Iwai Am. Corp.*, 726 F.Supp. 525, 534 (D.N.J. 1989), *aff'd without Op'n*, 899 F.2d 1218 (3d Cir.1990).

"The nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer*, 72 F.3d at 330 (citations omitted). If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex*, 477 U.S. at 321, 106 S.Ct. at 2551–52; *Brewer*, 72 F.3d at 330; *Siegel*, 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

## B. *ERISA Standard of Review*

Section 1132 of ERISA allows a participant or beneficiary to bring suit to recover benefits under a plan.[5] The standard courts apply when reviewing claims for benefits depends on whether the benefit plan vests the administrator or fiduciary with decision-making discretion as to eligibility.

■ When an employee benefit plan grants the plan administrator discretionary authority to construe the terms of the plan or to determine eligibility for benefits, a court may overturn the decision of the plan administrator only if it is deemed to be arbitrary and capricious. *Firestone Tire Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Epright v. Environmen-*

5. The ERISA statute provides that a civil action may be brought by a beneficiary "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B).

*tal Resources Mgmt. Inc. Health and Welfare Plan,* 81 F.3d 335, 342 (3d Cir.1996); *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 114 (3d Cir.1994); *Gillis v. Hoechst, Celanese Corp.,* 4 F.3d 1137, 1141 (3d Cir.1993), *cert. denied,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993); *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990); *Rizzo v. Paul Revere Insurance Group,* 925 F.Supp. 302, 306 (D.N.J.1996). The arbitrary and capricious standard is essentially the same as the abuse of discretion standard. *Abnathya,* 2 F.3d at 42 (citing *Nazay v. Miller,* 949 F.2d 1323, 1335 (3d Cir.1991)).

■ "In a case involving the interpretation of a provision of a pension plan, ... under the arbitrary and capricious standard, the trustee's interpretation 'should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan.'" *Moats v. United Mine Workers of America Health and Retirement Funds,* 981 F.2d 685, 688 (3d Cir.1992); *see also Dewitt v. Penn–Del Dir. Corp. et al.,* 106 F.3d 514, 519–20 (3d Cir. 1997).

■ "[W]hen the arbitrary and capricious standard applies[,] the decisionmaker's determination to deny benefits must be upheld unless it was 'clear error' or not 'rational'.'" *Gillis,* 4 F.3d at 1141 (quoting *Shiffler v. Equitable Life Assurance Soc'y,* 838 F.2d 78, 83 (3d Cir.1988)); *See also Abnathya,* 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp.,* 720 F.Supp. 491, 500 (W.D.Pa.1989) ("district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'")).

Drawing on analogies between a plan administrator and a trustee, the *Firestone* Court explained that "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." 489 U.S. at 111, 109 S.Ct. at 954; *see also Davis v. Burlington Indus.,* 966 F.2d 890, 895 (4th Cir.1992) ("If the language is unclear, we must defer to a rea-

sonable interpretation of the plan by the [plan administrator]. If the plan language is unambiguous, however, we would not defer to a contrary interpretation by the [plan administrator].").

By contrast, in circumstances where a plan does not contain language granting discretionary authority, a *de novo* standard of review is applied to a plan administrator's denial of benefits. *Id.* "Selection of an appropriate judicial standard of review therefore turns on the terms of the plan." *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1254 (3d Cir.1993) (quoting *Firestone,* 489 U.S. at 111, 109 S.Ct. at 954–55); *see also Rizzo,* 925 F.Supp. at 307–08.

■ Generally, plan language alone will govern whether the plan grants discretionary authority. *Nazay,* 949 F.2d at 1323. The Third Circuit, however, has concluded that discretion can be implied as well as express. *Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176 (3d Cir. 1991) (recognizing that a finding of discretion is not conditioned upon a particular verbal formula). Courts have applied the arbitrary and capricious standard where a fiduciary has discretionary authority in making eligibility determinations even where the word "discretion" was not used in the plan. *See Nazay,* 949 F.2d at 1335 (discretion found based on authority to "interpret and construe provisions ... determine eligibility ... make and enforce rules ... decide questions...."); *Stoetzner,* 897 F.2d at 119 (discretion found based on authority to "administer, ... decide all questions," interpret and apply rules)

Courts have found discretionary authority conferred on an administrator who is required to determine "whether an applicant is 'disabled,' using medical evidence *satisfactory* to the [insurance] company." *Miller v. Metropolitan Insurance Co.,* 925 F.2d 979, 983 (6th Cir.1991) (emphasis supplied); *see also Bali v. Blue Cross and Blue Shield Ass'n,* 873 F.2d 1043, 1047 (7th Cir.1989) (same). Discretion has been found to be conferred when the plan permits the administrator to decide "what sort of evidence may be required from the applicant to provide a basis for the subsequent ... determination."

*Miller,* 925 F.2d at 984; *Bali,* 873 F.2d at 1047.

## C. *Appropriate Standard of Review*

██ In the instant matter, the DuPont Plan states:

The administration of this [DuPont Plan] is vested in the Board of Benefits and Pensions appointed by the Company. The Board may adopt such rules, or delegate to one or more persons its authority to make initial determination, as it may deem necessary for the proper administration of the [DuPont Plan]. The Board of Benefits and Pensions retains *discretionary authority to determine eligibility for benefits hereunder* and to construe the terms and conditions of the [DuPont Plan] The decision of the Board in all matters involving the interpretation and application of this [DuPont Plan] shall be final.

*See* DuPont Plan at 8 (emphasis added). The language vests the Board with discretionary authority to make decisions of benefit eligibility as well as to construe the terms of the DuPont Plan. *See Burlison v. E.I. du Pont de Nemours & Co.,* Civ. Action No. 95–2076–D, slip op. at 5 (W.D. Tenn. 14 May 1996) (finding identical language to confer the requisite discretion to employ arbitrary and capricious standard)

██ Pokol argues in favor of the application of a *de novo* standard, as opposed to the arbitrary and capricious standard. Opposition Brief at 5–6. Pokol claims a plan must contain the plain language of "arbitrary and capricious" as a prerequisite to the application of the heightened standard. *Id.* at 6. Pokol's argument lacks merit.

Courts have not required a plan to explicitly identify the applicable standard of review before applying the arbitrary and capricious standard. *See Firestone,* 489 U.S. 101, 109 S.Ct. 948 (1989) ("[W]here discretion is conferred upon the trustee with respect to the exercise of a power, it's exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion."); *de Nobel v. Vitro Corp.,* 885 F.2d 1180 (4th Cir.1989) ("There are obviously no magic words required to trigger the application of one or another standard of judicial re-

view. . . . [I]t . . . need only appear on the face of the plan documents that the fiduciary has been 'given [the] *power* to construe disputed or doubtful terms'. . . . " *Id.* at 1187 (quoting *Firestone,* 489 U.S. at 111, 109 S.Ct. at 955–56) (emphasis in original)); *Arber v. Equitable Beneficial Life Ins. Co.,* 848 F.Supp. 1204, 1211 (E.D.Pa.1994) (same); *see also Abnathya,* 2 F.3d at 45 (if plan contains language giving administrator discretion to make eligibility determinations, arbitrary and capricious standard applies); *Stoetzner,* 897 F.2d at 119 (same); *Miller,* 925 F.2d at 983 (same)

Pokol cites to *Gillis* for support that the language "arbitrary and capricious" must be included in the DuPont Plan before application of the deferential standard is permissible. Opposition Brief at 5. The *Gillis* court, as well, examined the plan language in that case for the purpose of determining if the plan administrator was granted discretion. 4 F.3d at 1141. Although the plan in *Gillis* contained the wording "arbitrary and capricious", the court did state it found that language to be dispositive. After reviewing the plan, the court commented: "[U]nder this provision, the [human resources department] was given discretion to interpret the terms of the . . . policy when making eligibility determinations. Consequently, we apply the arbitrary and capricious standard when reviewing the [decision to deny benefits]." *Id.*

The DuPont Plan expressly grants the Board with discretionary authority to make decisions as to eligibility and to construe the terms of the DuPont Plan. *See* DuPont Plan at 2. Accordingly, the analysis in the instant matter must start from the premise that review of the Board's decision is guided by the "arbitrary and capricious" standard. *Abnathya,* 2 F.3d at 42; *Rizzo,* 925 F.Supp. at 308.

## D. *Application of the "Arbitrary and Capricious" Standard*

A review of the record in this matter demonstrates the decision of the Board to deny Pokol benefits was not "clear error." *See Shiffler,* 838 F.2d at 83. Rather, it appears the interpretation by the Board of the Du-

Pont Plan language was "rationally related to a valid plan purpose." *See Moats,* 981 F.2d at 688.

At all relevant times, the DuPont Plan provided:

An individual shall be considered "totally and permanently disabled" if the [Board] finds that he [or she] is totally disabled by injuries or disease and presumably will be totally and permanently disabled from pursuing any gainful occupation.... The determination of whether an employee is totally and permanently disabled shall be made on the basis of his [or her] condition immediately prior to his [or her] termination of service with [DuPont], and an employee who becomes totally and permanently disabled after termination of service with [DuPont] will not qualify for benefits under this [DuPont Plan]

*See* DuPont Plan at 2. Although the DuPont Plan does not define the term "totally and permanently disabled", the Board "retains discretionary authority to determine eligibility for benefits hereunder and to *construe the terms and conditions of the DuPont Plan." See* DuPont Plan at 8 (emphasis added). At all relevant times, DuPont has

consistently interpreted this [p]lan language to mean that benefits are to be denied unless it can be demonstrated by satisfactory, objective medical information that an applicant was totally incapable of pursuing gainful employment at the point immediately prior to her termination, and that the disability was expected with a reasonable degree of medical certainty to be lifelong.

Moving Brief at 18–19 (emphasis in original text); *see* Brenner Affidavit, ¶ 5.

An employee who applies for benefits under the DuPont Plan is required to produce "[s]atisfactory medical evidence ... on which the Board may base a finding that [he or she] is totally and permanently disabled...." *See* DuPont Plan at 6. DuPont requires an applicant for total and permanent disability benefits to produce "objective medical evidence". *See* Moving Brief at 4, 18–19; Brenner Affidavit, $ 5. Indeed, Pokol was informed in the 17 September 1993 Letter from Watson that she "must provide suffi-

cient *objective* medical data to indicate that [she is] totally and permanently impaired." *See* 17 September 1993 Letter (emphasis added). Pokol was further advised that "[e]xamples of [such] data would be x-rays, MRI reports, or other diagnostic tests." *Id.*

Pokol finds it significant that "[n]owhere in the DuPont Plan's language does it state the phrase 'objective medical evidence' or 'objective medical data or information.' " Opposition Brief at 9. Pokol argues the failure of the DuPont Plan to define "objective medical evidence" is a "fatal flaw which requires a finding that the denial of disability benefits to [Pokol] was ... arbitrary and capricious." *Id.* at 12.

■ As discussed, the DuPont Plan expressly grants the Board the "discretionary authority ... to construe the terms and conditions of the [DuPont Plan]." *See* DuPont Plan at 8. Interpreting the language "satisfactory medical evidence" to include "objective medical evidence" is neither irrational nor unreasonable. *See, e.g., Moats,* 981 F.2d at 688 (plan administrator's interpretation of a plan provision "should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan."). It cannot be said that DuPont's requirement of "objective medical evidence" was arbitrary or capricious, especially considering Pokol was advised of this requirement in the 17 September 1993 Letter.

■ Pokol additionally argues "the definition of totally and permanently disabled is also flawed and leads to a conclusion of arbitrary and capricious behavior on the part of the Board." Opposition Brief at 12. The DuPont Plan states:

An individual shall be considered "totally and permanently disabled" if the Board of Benefits and Pensions finds that he [or she] is totally disabled by injuries or disease and *presumably* will be totally and permanently prevented from pursuing gainful employment....

*See* DuPont Plan at 2 (emphasis added). Pokol criticizes the use of the term "presum-

ably" because, she argues, "there is no room for presumptions" when a plan rests its decisions on objective medical evidence. Opposition Brief at 12–13.

It is unclear how the term "presumably" in the DuPont Plan demonstrates the arbitrary and capricious nature of the Defendants' denial of benefits to Pokol. The issue here is not whether the drafting of the DuPont Plan was unclear, but whether the administrators' interpretation of the plan was reasonable. *Cf. Moench v. Robertson,* 62 F.3d 553, 566 (3d Cir.1995) (citing factors to determine whether plan interpretation was reasonable), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996); *McCall v. Metropolitan Life Ins. Co.,* 956 F.Supp. 1172, 1181–82 (D.N.J.1996).

The Third Circuit has held that the ERISA fiduciary standards do not apply to employers with regard to the design of the language of their employee benefit plans. *See, e.g., Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan,* 24 F.3d 1491, 1498 (3d Cir.1994) (the concern of ERISA is with the administration of benefit plans and not with the precise design of the plan), *cert. denied,* 513 U.S. 1149, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1159 & n. 3 (3d Cir.1990) (distinguishing between employer's administration decisions "to which ERISA fiduciary duties attach and its 'design' decisions, as to which it remains free to 'act[ ] as an employer and not a fiduciary.'") (citations omitted). The decision of the Board should not be rendered arbitrary and capricious due to the alleged poor drafting of the DuPont Plan.

### 1. *Initial Application*

The Board considered a plethora of submissions from Pokol in evaluating her application for disability benefits. *See* Ramirez Affidavit, ⁋ 10–30; Exhibits 6–25, attached to Defendants' Appendix. In her Initial Application, Pokol produced several items of medical evidence, which Dr. Ramirez concluded did not support her claim for disability benefits. *See,* generally, Ramirez Affidavit, ⁋ 12–21.

In the 8 June 1993 Letter, Dr. Lichtbroun surmised Pokol was "totally disabled from her current occupation" and "unable to lift more than five pounds." *See* 8 June 1993 Letter. Significantly, the 8 June 1993 Letter did not provide any opinion as to whether Pokol was "totally incapable of pursuing gainful employment", or whether her disability appeared to be "lifelong" as required by the DuPont Plan. *See* Moving Brief at 18–19. Dr. Ramirez, in reviewing the 8 June 1993 Letter found that Dr. Lichtbroun "recites subjective symptoms, rather than presenting objective medical evidence." Ramirez Affidavit, ⁋ 14.

The 6 May 1993 Psychological Evaluation, performed by Dr. Fiedler, diagnosed Pokol with Panic Disorder and Major Depression. *See* 6 May 1993 Psychological Evaluation. Dr. Fiedler did not formally diagnose the physical etiology of Pokol. *Id.* at 7. Dr. Fiedler stated "[r]ather than be totally disabled, it would be better to place [Pokol] in a job she can accomplish (e.g. reception or other light duty jobs)." *Id.* at 8. Dr. Fiedler concluded "[f]uture job placement will depend on [Pokol's] ability to gain both physical and psychological strength." *Id.* Dr. Ramirez interpreted Dr. Fiedler's comments to mean Pokol "would be best served by returning to work." Ramirez Affidavit, ⁋ 15.

The 11 March 1993 Letter from Dr. Rehman to Dr. Renda found Pokol's pain syndrome to be "suggestive of fibromyalgia." See 11 March 1993 Letter. Dr. Rehman recommended starting Pokol on the medications Elavil and Anaprox, as well as possibly initiating a regimen of physical therapy. *Id.* The 11 March 1993 Letter also suggested an EMG study, as well as a CAT scan and an MRI. *Id.* at 3. Significantly, the 11 March 1993 Letter provided no medical conclusion as to Pokol's ability to work, or as to the severity of her disability. *Id.*

The 18 February 1993 Letter to Dr. Renda from Dr. Deltieure did not include pertinent diagnoses, but stated that any of Pokol's impairments were expected to be permanent. *See* 18 February 1993 Letter. Dr. Renda suggested restricting Pokol's present job description of machine operator. *Id.* In response to the question "[i]f not presently

capable of performing [her job activities], for how long?", Dr. Renda responded, "Not able to determine." *Id.* Dr. Renda also answered "yes and no" to the question of whether Pokol was capable of pursuing any gainful employment. *Id.*

The 4 March 1993 Letter from Dr. Renda to the DuPont Medical Department diagnosed Pokol with "Cervical Myositis and Spasm, Thoracic Myositis and Spasm, Trapezius Myositis and Spasm, Costochondratis, S/P Cervical Disc Surgery, Depression and Anxiety Neurosis." *See* 4 March 1993 Letter. Dr. Renda indicated: *"These problems are permanent ... [Pokol] is not a candidate for her present job description." Id.* (emphasis in original). Dr. Ramirez noted Dr. Renda's diagnoses "are temporary conditions of inflammation, not permanent ones." Ramirez Affidavit, ¶ 16. Furthermore, Dr. Ramirez found the submission lacked objective medical evidence, such as MRI or x-ray examinations. *Id.* The 4 March 1993 Letter did not indicate Pokol was incapable of pursuing any gainful occupation but rather indicated Pokol was not a candidate for her *present* job description. *Id.*

The 2 June 1993 Letter from Dr. Renda to Dr. Deltieure diagnosed Pokol with the following "Fibromyalgia, S/P Cervical Disc Surgery, Cervical Arthritis, Costochondratis, Anxiety Neurosis, [and] Cervical Myositis." *See* 2 June 1993 Letter. Dr. Renda concluded Pokol was "not physically or mentally able to work *at the present time." Id.* (emphasis added). Dr. Ramirez found again no objective medical evidence which would support

the diagnosis of Dr. Renda. Ramirez Affidavit, T 17.

The 13 April 1993 Letter from Dr. Rehman to Dr. Deltieure concluded "[Pokol] may not be able to do her duties as a machinist *but may be capable of other jobs* not requiring any heavy lifting, pushing, or pulling." *See* 13 April 1993 Letter (emphasis added). Dr. Ramirez found this to be significant. Ramirez Affidavit, ¶ 18. Dr. Rehman suggested a course of "prolonged medical treatment, psychotherapy, and physical therapy." *Id.*

The 1 April 1993 Schlesinger Report stated: "As far as job performance, her physical disabilities preclude her from doing her job more than any psychiatric problems." *See* 1 April 1993 Schlesinger Report. Dr. Schlesinger provided no opinion as to Pokol's ability to pursue gainful employment or as to the expected length of her disability. Dr. Ramirez found significant Dr. Schlesinger did not conclude Pokol was "suffering from major depression or any other permanent psychiatric diagnosis." Ramirez Affidavit, ¶ 19.

The 25 June 1993 Medical Report, prepared by Dr. Deltieure, noted "no significant findings," based on a physical examination of Pokol. *See* 25 June 1993 Medical Report; Ramirez Affidavit, 20. Dr. Deltieure reported that "Dr. Fielder does not feel that [Pokol] is total (sic) and permanently disabled." *Id.* at 3 (all capitals removed). The 25 June 1993 Medical Report reported Dr. Lichtbroun's conclusion that Pokol's condition "is chronic and that [she] will be totally disabled from performing her current job duties for at least the next year." *Id.*[6]

---

**6.** Pokol submits it was arbitrary and capricious conduct for the Defendants to emphasize the lack of "objective medical evidence" in support of their decision, and then to rely on the conclusion of Dr. Feidler, a psychologist who is not a medical doctor. Opposition Brief at 11, 13–14. Pokol submits, "[i]n no way could [Dr.] Fiedler state in her opinion to a medical certainty" because she is not authorized to practice medicine. Opposition Brief at 14.

A review of the entire record demonstrates the decision of the Defendants was not based on the recommendation of Dr. Feidler, but on all of the submissions which the Defendants determined did not fulfil the definition of totally and permanently disabled pursuant to the DuPont Plan. The DuPont Plan requires that satisfactory medical

evidence demonstrate the applicant is totally and permanently disabled. *See* DuPont Plan at 6. What is required is an affirmative showing of benefit eligibility, not an attack on the negative data opposing her application. Reply Brief at 5. Even assuming this argument has merit, the failure of Pokol to submit objective medical data in the supporting documents still renders her application inadequate. *See Allison v. Dugan*, 951 F.2d 828, 833 (7th Cir.1992) (denial of benefits not arbitrary and capricious where plaintiff could not show denial of benefits was "so implausible based upon the evidence that it could no be ascribed to a difference in view") (citations and internal quotes omitted) Accordingly, the argument that Dr. Fiedler's report does not indicate Pokol "is not totally and permanently dis-

Based on the initial submissions by Pokol, Dr. Ramirez found "no objective medical evidence presented to indicate that she was totally and permanently disabled." Ramirez Affidavit, ¶ 21. Drs. Rehman, Fiedler, and Deltieure found Pokol to be capable of working, even if in a limited capacity. *See* 25 June 1993 Medical Evaluation Report, 6 May 1993 Psychological Evaluation, 13 April 1993 Letter. Drs. Renda and Lichtbroun concluded Pokol was suffering from a disability, but did not state Pokol was incapable of pursuing gainful employment. See 8 June 1993 Letter, 4 March 1993 Letter, 2 June 1993 Letter. Dr. Ramirez provided Pokol with a "good" prognosis of recovery and for "reliably performing activities of usual work . . ." Ramirez Affidavit, T 21. Accordingly, Dr. Ramirez recommended that the Initial Application for disability benefits be denied. *Id.* The Board agreed with the recommendation and communicated the denial of benefits to Pokol in the 17 September 1993 Letter.

### 2. *Supplemental Application*

In response to the 17 September 1993 Letter, Pokol submitted additional documentation in support of her claim. Among the submissions in the Supplemental Application was the 18 October 1993 Letter from Dr. Renda to Congressman Pallone, which stated Pokol "has numerous medical problems that have prevented her from working at her present job." See 18 October 1993 Letter.[7] Dr. Renda provided several diagnoses, but, significantly, did not state Pokol was disabled.

The Supplemental Application also contained a the 11 March 1993 Letter from Dr. Rehman and the 12 July 1993 Letter from Dr. Lichtbroun. See 11 March 1993 Letter; 12 July 1993 Letter.

Dr. Ramirez reviewed the supplemental submission and determined "that these new submissions contained no objective medical data that would change the original initial

determination that [Pokol] was not totally and permanently disabled as defined by the plan." Ramirez Affidavit, 1 23. The Board communicated its decision to deny the Supplemental Application for benefits in the 6 December 1993 Letter.

### 3. *Appeal*

In response to the 6 December 1993 Letter, Pokol submitted additional medical evidence in support of her Appeal. The 17 January 1994 Letter from Dr. Hodes did not state an opinion as to whether Pokol was totally or permanently disabled. *See* 17 January 1994 Letter. Rather, the 17 January 1994 Letter indicated that "[i]f we were to go by the patient's symptoms, then she would find it very difficult to work in any reasonable job." *Id.* Furthermore, Dr. Hodes wrote "[t]he issue of disability should be determined by an independent practitioner." *Id.*

The 2 February 1994 Letter to Dr. Deltieure from Dr. Lichtbroun, stated "[Pokol] is certainly unable to be gainfully employed in any occupation." *See* 2 February 1994 Letter. Dr. Ramirez, after reviewing the 2 February 1994 Letter, determined "no objective medical evidence was presented to support [Dr. Lichtbroun's] naked opinion." Ramirez Affidavit, ¶ 27.

The 14 February 1994 Medical Report, prepared by Dr. Deltieure, advised Pokol fit for "sedentary work[8] at this time. No lifting, no pulling and no pushing." *See* 14 February 1994 Medical Report. Based on this report, Dr. Ramirez concluded Pokol "was able to return to work with certain restrictions at that time." Ramirez Affidavit, ¶ 28.

The 22 January 1994 Surgical Pathology Report provided a description and diagnosis of a biopsy performed on Pokol. The diagnosis concluded

---

abled at the time the evaluation was done," Opposition Brief at 13, is not persuasive.

**7.** Attached to the 18 October 1993 Letter were the 11 March 1993 Letter from Dr. Renda, the 13 September 1993 Letter to Congressman Pallone and the 6 December 1993 Letter to Kaczmarex.

**8.** Sedentary work is defined in the 14 February 1994 Medical Report as "Lifting 10 lbs. Though a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out duties." *See* 14 February 1994 Medical Report.

A. Duodenal Mucosa (Biopsy). No significant abnormality. B. Antral Gastritis, mild, nonspecific. No Helicobacter seen. C. Squamous Mucosa, no significant abnormality (Esophageal Biopsy)

*See* 22 January 1994 Surgical Pathology Report. No opinion is stated in the 22 January 1994 Surgical Pathology Report as to the ability of Pokol to work or as to the extent or nature of her disability.

The 7 March 1994 Report, performed by Dr. Deltieure, discussed the medical complaints of Pokol. *See* 7 March 1994 Report. Pokol expressed experiencing severe abdominal pain and distention, as well as diarrhea, nausea, and vomiting. *Id.* The Report indicated Pokol expressed inability to do household chores, as well as difficulty walking. *Id.* Dr. Deltieure considered the possibility of a janitorial assignment for Pokol, with appropriate accommodations made for her medical restrictions. *Id.* at 2. Based on the 7 March 1994 Report, Dr. Ramirez concluded Dr. Deltieure determined Pokol "was able to work, with certain restrictions." Ramirez Affidavit, ¶ 29.

After reviewing the medical information provided in the Appeal, Dr. Ramirez recommended to the Board denial of the application for total and permanent disability benefits. Ramirez Affidavit, ¶ 31. The Board determined "there was insufficient information to conclude that [Pokol] met [DuPont's] interpretation of the [DuPont Plan's] requirement that she be totally and permanently prevented from pursuing any gainful occupation be her medical conditions." Brenner Affidavit, 1 17. Pokol was notified of the Board decision through the 10 June 1994 Letter.

■ Applying the arbitrary and capricious standard to the present case, and upon review of the evidence submitted in the Initial Application, the Supplemental Application, and the Appeal, it cannot be said the decision to deny Pokol total and permanent disability benefits was either "clear error" or not "rational". *See Gillis,* 4 F.3d at 1141; *Shiffler,* 838 F.2d at 83.

The submissions of Drs. Fiedler, Deltieure, and Rehman, provide support for the deci-

sion by the Board to deny Pokol benefits. *See, e.g., Abnathya,* 2 F.3d at 47 (held to be reasonable for plan administrator to base his decision to terminate long-term disability benefits on independent evaluations by two doctors chosen by the plan, rather than the testimony of Abnathya's physician). Especially compelling is the conclusion supplied by Dr. Rehman, retained by Pokol, who indicated that, although Pokol may not be able to perform her duties as a machine operator, Pokol was capable of performing other work. *See* 13 April 1993 Letter.

As well, the Defendants have demonstrated how the submissions that appear to support the application of benefits are limited and qualified and fall short of the stringent definition of "total and permanent disability" as set out in the DuPont Plan. Moving Brief at 22. These submissions are temporally qualified and limit the medical assessment to either Pokol's present job or her present condition at the time of the examination; the submissions do not indicate Pokol is an eligible candidate for benefits because she is permanently prevented from working in any gainful employment. *Id.; see* 4 March 1993 Letter (Pokol "not a candidate for her *present* job description"); 2 June 1993 Letter (Pokol is not physically or mentally able to work *at the present time* ); 8 June 1993 Letter (Pokol is "totally disabled from her *current* occupation"); 18 October 1993 Letter ("[Pokol] has numerous medical problems that have prevented her from working at her *present* job") (emphasis added). As stated, the supporting documents are unaccompanied by objective medical examination evidence.

The analysis of Dr. Ramirez further buttresses the Board's decision. All the information submitted in support of the Initial Application, the Supplemental Application and the Appeal was reviewed by Dr. Ramirez, who determined Pokol failed to meet the definition established by the DuPont Plan and by the Board for "totally and permanently disabled." The DuPont Plan specifically authorized the employment of persons to render advice regarding the responsibilities of DuPont and its Board under the DuPont

Plan. *See* DuPont Plan at 8.[9] Dr. Ramirez was employed to use his professional judgment to review, analyze and summarize the medical information and to make recommendations to the Board, consistent with his medical opinion. Moving Brief at 20. Accordingly, the opinion of Dr. Ramirez constitutes further evidence in support of the Board's decision.

The arbitrary and capricious standard of review requires the application of deference to the plan administrator's decision, unless that decision is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Abnathya*, 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. 491, 500 (W.D.Pa. 1989)). A reviewing tribunal "is not free to substitute its own judgment for that of the [Defendants'] in determining eligibility for plan benefits." *Id.* (quoting *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D.Pa.1984), *aff'd*, 760 F.2d 259 (3d Cir.1985)). The Third Circuit has adopted a series of factors to assist the determination of whether the interpretation of a plan was reasonable. *See Moench*, 62 F.3d at 566. The factors consist of

(1) whether the interpretation is consistent with the goals of the plan; (2) whether it renders any language in the plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [administrator] interpreted the provision at issue inconsistently; and (5) whether the interpretation is contrary to the clear language of the plan.

*Moench*, 62 F.3d at 566 (citations omitted). None of these factors weigh in a favor of a determination of arbitrary and capricious conduct on behalf of the Defendants.

The submissions presented are not sufficient to determine the decision of the Board was unreasonable. The decision rendered was not inconsistent with the goals of the DuPont Plan, which is "to protect eligible employees against substantial loss of earnings in the event of total and permanent disability resulting from injury or disease...." *See* DuPont Plan at 1. As discussed, many of the submissions fall short of the requirement of finding total and permanent disability by quantifying the medical assessment to either Pokol's present job or present condition. Even the submissions most favorable to Pokol's position lacked the objective medical data required by the Board to support an eligibility finding. Accordingly, the first and fifth *Moench* factors do not suggest arbitrary or capricious behavior.

The second and third factors also appear to be satisfied. The interpretation of the DuPont Plan in the instant matter does not render any language in the DuPont Plan meaningless or internally inconsistent, especially in light of the discretion granted the Board in construing the terms and conditions of the DuPont Plan. The DuPont Plan also does not appear to conflict with the substantive or procedural requirements of ERISA.

Finally, the fourth factor is also satisfied. Dr. Ramirez set forth the manner in which the determination of eligibility for total and permanent benefits has been consistently interpreted and applied during his tenure at DuPont. *See* Ramirez Affidavit, ¶ 4. As well, Brenner stated that "Pokol's application was treated no differently from any other application or appeal by the Board." *See* Brenner Affidavit, ¶ 11. As is discussed more fully below, Pokol has set forth no evidence to demonstrate that the Board has interpreted the provision at issue inconsistently or disparately. Accordingly, the fourth *Moench* factor also does not weigh in favor of an unreasonable interpretation of the DuPont Plan.

Pokol offers a report from her expert, Dr. David M. Meyers ("Dr.Meyers") for his conclusion that Pokol "is totally and permanently disabled from all causes and conditions

---

9. Article VIII, Section A states,

The Company shall have the authority to control and manage the operation and administration of this [DuPont Plan] and to designate one or more persons to carry out the responsibilities of the operation and administration of this [DuPont Plan]. The Company or such person or persons as the Company may designate, may employ one or more persons to render advice with regard to any responsibility of the Company or any such person under this [DuPont Plan]

DuPont Plan at 8.

well elaborated above since she obviously has not, despite every effort, gained both physical and psychological strength to be a viable independent work unit." *See* Report of Meyers, attached as Exhibit D to Madden Certification. The issue before the court, however, is whether the Board decision was arbitrary and capricious at the time it rendered the decision. *See Abnathya*, 2 F.3d at 48 & n. 8 (in reviewing a final decision of a plan administrator, the court may consider only evidence that was in the administrative record) (citing *Miller*, 925 F.2d at 986). The Board's determination is not rendered arbitrary and capricious solely based upon the opinion of Dr. Meyers.

### E. *Alleged Bad Faith*

■ Pokol argues summary judgment should be denied because a reasonable factfinder could determine the Defendants acted in bad faith and/or Pokol was treated disparately. Opposition Brief at 17. Pokol submits where the existence of bad faith, bias or disparate treatment can be demonstrated, a denial of benefits should be reversed as arbitrary and capricious. Pokol contends there is evidence of bias on the part of Dr. Deltieure and other employees at the DuPont facility where Pokol worked, which would implicate bad faith in the decision to deny Pokol benefits. In support of her argument, Pokol proffers the following evidence:

Gerry McCarthy[10] told [Pokol] that she should go to the REACH program alleging that [she] was taking non-prescription drugs.

[Dr. Deltieure] told [Pokol] to go get psychiatric help. Although Dr. Deltieure conceded that [Pokol] had numerous physical or organic diseases or conditions, she stated to [Pokol] on numerous occasions that all of [Pokol's] physical problems were "in her mind."

[Pokol] had to wear a brace in the work place (sic) on her left arm ordered by Dr. Renda in approximately 1993.

Gerry McCarthy told [Pokol] to get help from other women on the floor for lifting and bending . . .

Dr. Deltieure asked [Pokol] "how can you drive to work with the brace[?]" [Pokol] replied "I manage as best I can."

*See* Pokol Answers to Defendants' Interrogatories, attached as Exhibit "A" to Madden Certification.

The evidence submitted by Pokol does not create a genuine issue of material fact as to whether the Defendants acted in bad faith. The evidence also lacks relevance as to whether the Defendants acted arbitrarily because Pokol did not present this information to the Board when they deliberated on her benefits eligibility.

Pokol cites to the decision in *Kotrosits* for the proposition that "[w]here the claimant demonstrates that it would be inequitable to defer to the Plan Administrator, stricter scrutiny of his decision is in order." *Kotrosits v. GATX Corp.*, 970 F.2d 1165, 1172 (3d Cir.1992), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992). Pokol further contends arbitrary and capricious behavior may be found where a plaintiff can show the exercise of discretion by the plan administrator is tainted, *id.*, at 1173, or where the plan administrator "treated similarly situated employees differently, imposed . . . unreasonable requirements upon [the plaintiff], refused to consider evidence favorable to the claim, or in any way grossly erred in its exercise of judgment." *Glover v. South Central Bell Telephone Company*, 644 F.2d 1155, 1158 (5th Cir.1981). *See* Opposition Brief at 18.

Even assuming such considerations are appropriate in the instant matter, *see Bickel v. Long Term Disability Plan of Western Electric*, 541 F.Supp. 685, 686 (E.D.Pa.1982) (addressing bad faith test in *Glover* but indicating the appropriate standard in the Third Circuit is the "arbitrary and capricious test"), the argument fails because the evidence is insufficient for any reasonable fact-finder to determine bad faith on the part of Defendants.

Pokol has not produced any evidence showing DuPont "treated other similarly sit-

---

**10.** It appears Gerry McCarthy is a non-medical site employee. Reply Brief at 7.

uated employees differently...."[11] *See Glover,* 644 F.2d at 1158. Pokol has not even alleged Defendants "imposed any unreasonable requirements upon [her]. ...." *Glover,* 644 F.2d at 1158. There is no evidence to support the proposition the Board "refused to consider evidence favorable to the claim...." *See Id.; see also Pierce v. American Waterworks Company, Inc.,* 683 F.Supp. 996, 999 (W.D.Pa.1988). Finally, Pokol has not shown Defendants "grossly erred in [their] exercise of judgment." *Glover,* 644 F.2d at 1158. As discussed, it appears the decision to deny Fokol benefits was based upon sufficient evidence demonstrating Pokol did not meet the requirements of total and permanent disability set forth by the DuPont Plan.

Pokol's reliance on *Kotrosits* for the application of a heightened standard due to bad faith is inapposite to the case at bar. 970 F.2d at 1165. The *Kotrosits* court considered an alleged conflict of interest of a plan administrator in connection with a stock sale and subsequent pension plan termination. The Circuit reversed the finding of bad faith and instead applied the arbitrary and capricious standard of review. The *Kotrosits* court found the administrator's interpretation of the plan to be reasonable under that standard.

As well, Pokol's reliance on *Facchina v. NECA–IBEW Local 176 Health and Welfare,* 702 F.Supp. 641 (N.D.Ill.1988), is unpersuasive. In that case, plaintiff requested medical benefits through an ERISA welfare plan for a penile implant procedure. A fund trustee authored cartoons depicting the plaintiff's illness in a "mocking, demeaning manner." *Id.* at 644. The cartoons were subsequently photocopied and distributed at a job site where the plaintiff was working. These actions, taken by the fund trustee, indicated the trustee did not hear plaintiff's claim with sincerity.

In *Facchina,* the fund trustee was personally responsible for engaging in the bad faith action. Here, the allegations of bad faith were not committed by the Board, but by Dr. Deltieure and a non-medical site employee, Gerry McCarthy. Indeed, it is not alleged Pokol ever raised her suspicions of bad faith on the part of Dr. Deltieure for consideration by the Board. Accordingly, Pokol has failed to produce sufficient evidence to demonstrate the Defendants acted with bad faith or to create a genuine issue of material fact as to whether the Defendants acted in an arbitrary or capricious manner.

### F. *Award of Social Security Benefits*

██ Pokol argues the Board's decision to deny her total and permanent disability benefits in light of an award of Social Security disability benefits renders the determination arbitrary and capricious. *See* Complaint, ¶ 10. On 14 May 1994, Judge Fliegler concluded Pokol "was 'disabled' as defined in section 1614(a)(3)(A) of the Social Security Act...." *See* Administrative Law Decision.

The *Burlison* court, in considering an identical argument, held: "Social Security determinations are not binding on ERISA plans, and should not have unintended side effects on such plans not contemplated by the parties in initiating the plans, or by Congress in creating the Social Security disability structure." *Burlison,* slip op. at 15 (citing *Pagan v. Nynex Pension Plan,* 846 F.Supp. 19, 20 (S.D.N.Y.1994), *aff'd,* 52 F.3d 438 (2d Cir. 1995); *Anderson v. Operative Plasterers,* 991 F.2d 356, 358 (7th Cir.1993); *Madden v. ITT*

---

11. Pokol states "[s]ummary [j]udgment is clearly not ripe and discovery must continue." Opposition Brief at 24. Specifically, Pokol cites Defendants failure to answer an interrogatory requesting disclosure of "any and all individuals who applied for permanent and total income plan benefits ... [and] whether said applications were either granted or denied." *See* Defendants' Answers to Plaintiff's Interrogatories, attached as Exhibit C to Madden Certification, 15. Defendants objected to the interrogatory because it violated their legal obligations, as well as the privacy rights of non-parties, by disclosing medical records. *Id.* Pokol submits she is entitled to an inquiry into the treatment of similarly situated individuals in the workplace. Opposition Brief at 23.

This argument will not defeat summary judgment. As discussed in note 3, *supra,* Pokol failed to file an affidavit pursuant to Fed.R.Civ.P. 56(f) asserting the need for further discovery. As well, Pokol did not indicate she requested the court to compel an answer to this interrogatory. These procedural deficiencies preclude any contention that this matter is not ripe for summary judgment.

*Long Term Disability Plan,* 914 F.2d 1279, 1286 (9th Cir.1990) (not arbitrary and capricious to deny benefits without considering a finding by the social security board that plaintiff was totally disabled), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991)).

Pokol cites no controlling case law to support her argument that the Administrative Law Decision granting Pokol Social Security disability benefits should have been given consideration by the Board. Rather, Pokol draws an analogy from a recent Third Circuit decision which held a discharged employee, who certified under penalty of perjury that he was disabled when he applied for social security benefits, was judicially estopped from asserting that he was a qualified to perform the functions of his position under the ADA and NJLAD. *See McNemar v. Disney Store, Inc.,* 91 F.3d 610 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). Pokol submits "if the application for social security benefits estops an individual from bringing a suit against a private or public employer who has potentially discriminated against [him or her] ... then it would be extremely unjust for an individual to be denied a private disability plan when [he or she] had been awarded social security benefits." Opposition Brief at 27. Pokol argues the Defendants' should have given some weight to the decision of the Administrative Law Judge. *Id.*

The analogy drawn by Pokol from the *McNemar* decision is not persuasive. As stated, the issue before the court in *McNemar* was whether the plaintiff was judicially estopped from first claiming to be totally and permanently disabled in his application for social security benefits, and then from claiming to be qualified for his position for the purposes of a lawsuit brought pursuant to the ADA and NJLAD. The two positions asserted by the plaintiff were inherently contradictory and, therefore, disallowed by the court. *Id.* at 620.

In contrast, it is not inherently contradictory to permit an individual to recover benefits pursuant to the Social Security Act while being denied benefits pursuant to a private ERISA benefit plan. As recognized in *Bur-*

*lison,* the standards employed pursuant to each benefit provider are different. The Social Security Act is more lenient and permits social security benefits "to be granted when the claimant is to be disabled for a period 'not less than twelve months.'" *Burlison,* slip op. at 14 (citing 42 U.S.C. § 423(d)(1)(A), 42 U.S.C. § 1382c(a)(3)(A); *Garner v. Heckler,* 745 F.2d 383 (6th Cir.1984)). Under the DuPont Plan, however, the disability must total and permanent such that the applicant "presumably will be ... prevented from pursuing any gainful occupation." *See* DuPont Plan. Objective medical evidence must indicate that the disability is expected with reasonable medical certainty to be lifelong. Brenner Affidavit, ¶ 5.

 The Social Security Act was intended to be liberally construed, emphasizing inclusion rather than exclusion. *Id.* (citing *Black v. Sullivan,* 793 F.Supp. 45, 47 (D.R.I. 1992); *Bastien v. Califano,* 572 F.2d 908 (2d Cir.1978); *Rowe v. Finch,* 427 F.2d 417 (4th Cir.1970)). *See also Pagan on Behalf of Pagan v. Chater,* 923 F.Supp. 547, 550 (S.D.N.Y.1996) (intent of Social Security Act is inclusion, not exclusion). ERISA plans, however, are intended to promote the interests of employees and protect contractually defined benefits. *Burlison,* slip op. at 14 (citing *Shaw v. Delta Air Lines,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983); *Massachusetts Mutual Life Ins. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)); *see also Dewitt,* 106 F.3d at 519–20 (ERISA does not impose an obligation upon employers to provide benefits, but is concerned with the proper execution of plans once established); *Moench,* 62 F.3d at 560 (ERISA was enacted to "assure the equitable character of employee benefit plans and their financial soundness"); *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 58 F.3d 896, 901 (3d Cir.1995) ("ERISA is a comprehensive statute enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.") (internal quotations omitted).

Accordingly, a finding of eligibility under the Social Security Act does not require a finding of eligibility under the DuPont Plan.

To the extent Pokol argues that the failure of the Defendants' to give weight to the award by Judge Fliegler in the Administrative Law Decision, is evidence of arbitrary and capricious behavior, this too lacks merit. The Defendants considered each of the submissions presented by Pokol in support of her claim in her initial application for benefits and in her appeal. By way of the 10 June 1994 Letter, Pokol was advised her application for benefits was denied and her appeal rights within DuPont as required by ERISA had been exhausted. *See* 10 June 1994 Letter. The Administrative Law Decision was rendered on 14 May 1994. Counsel for Pokol advised the Defendants of the Administrative Law Decision in a letter, dated 26 October 1994. Based on this timeline, it was not arbitrary and capricious for the Board to fail to consider the Administrative Law Decision. It does not appear the Administrative Law Decision was before the Board when it rendered its decision. *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994). Accordingly, the failure of the Board to consider the grant of Social Security disability benefits in its decision to deny Pokol benefits under the DuPont Plan is not arbitrary and capricious.

*Conclusion*

For the reasons stated above, the Motion for Summary Judgment is granted.